SALT LAKE CITY et al. v. UTAH AND SALT LAKE CANAL CO. et al.

No. 2495. Decided December 12, 1913. Rehearing denied January 12, 1914 (137 Pac. 638).

1. MOTIONS—SUPPLEMENTAL DECREE—CONFORMITY TO PLEADINGS. Where, in a controversy among several irrigation companies as to property rights to the water of a river, the court, in its original decree, determined and adjudicated such rights, ordered the parties to construct proper appliances, etc., for the correct measurement and diversion of the amounts to which each was respectively adjudged entitled, appointed a commissioner to superintend such measurement and diversion, and also expressly retained jurisdiction to make any supplemental orders necessary to make effectual the rights awarded by the original decree, additional pleadings were not necessary to invoke such further action of the court; but a motion, filed by one of the parties six years afterwards, which stated that it was advised by the commissioner that certain improvements were needed to properly distribute the waters, etc., and moved for an order directing the parties to appear in court for a hearing to determine such improvement, was sufficient, and a decree ordering certain improvements to be made was not *coram non judice*, since, as such decree was only supplemental to the original decree, the issues formed by the original pleadings were sufficient, though the motion was informal, and the better practice would have been to have supported it by affidavits, yet, as the parties were in court and evidence introduced, this was not fatal. (Page 603.)

2. MOTIONS—APPEARANCE—WAIVER OF OBJECTIONS. Since, as the court, by the retention of jurisdiction in the original decree, had jurisdiction of the subject-matter, the parties, by appearing and taking part in the proceedings, waived any defect in the motion. (Page 604.)

3. APPEAL AND ERROR—HARMLESS ERROR—PLEADING. Though plead-ings should have been filed, yet the failure to file them was not prejudicial, since part of the evidence introduced on the hearing was a very elaborate report by the commissioner and two other engineers setting forth in detail just what im-provements were necessary, which showed plainly the matters before the court. (Page 604.)

4. APPEAL AND ERROR—WAIVER OF OBJECTIONS TO WANT OF PLEAD-INGS. A party whose counsel filed the motion upon which the action of the court was invoked, and on the hearing repeatedly stated that pleadings were unnecessary, and other parties who acquiesced in such action were estopped to thereafter complain that pleadings were not filed. (Page 606.)

5. WATERS AND WATER COURSES—APPROPRIATION—ACTION TO DE-TERMINE RIGHTS—EVIDENCE. Evidence, on a hearing to deter-mine whether a supplemental order was necessary to make effectual an original decree fixing the rights of irrigation com-panies in water of a stream, held to sustain a finding that cer-tain improvements were necessary for the proper measurement of the water to which each was entitled. (Page 607.)

6. WATERS AND WATER COURSES—APPROPRIATION—ACTION TO DE-TERMINE AND PROTECT RIGHTS—EVIDENCE. In a proceeding to determine whether certain improvements were necessary to make effectual water rights awarded to irrigation companies, and, if so, to apportion the cost, evidence held not to sustain a finding that the construction of a dam and measuring devices below the intakes of two of the companies would be for the joint benefit of all. (Page 609.)

7. WATERS AND WATER COURSES—DETERMINATION OF WATER RIGHTS—SUPPLEMENTAL DECREE. Where an original decree, after de-termining the rights of irrigation companies in the water of a river, provided that the parties should "construct at their own cost proper appliances for the measurement of the waters awarded to them respectively," a supplemental decree, prorating to all the cost of a dam and weir located below the intakes of two of the companies, conflicted therewith, and was void. (Page 612.)

STRAUP, J. dissenting in part.

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Proceedings by Salt Lake City against the Utah & Salt Lake Canal Company and others to determine whether cer-

tain improvements were necesary to be made in a river to protect water rights awarded to the parties by the original decree.

Decree ordering certain improvements to be made, and prorating the costs. The Utah & Salt Lake Canal Company, the Telluride Power Company, and the East Jordan Irrigation Company appeal.

AFFIRMED.

*Thurman, Wedgwood & Irvine* for Utah & Salt Lake Canal Co.

*S. A. Bailey* and *E. C. Lackner* for Telluride Power Co.

*Powers, Marioneaux, Stott & McKinney* for East Jordan Irrigation Co.

*John M. Cannon* for South Jordan Canal Co.

*Stewart, Stewart and Alexander* for North Jordan Irrigation Co.

*F. S. Richards* for Salt Lake City.

APPELLANTS' POINTS.

A judgment not based on written pleadings or not within issues, either of law or fact, is void. (Black, on Judgment, Sect. 242; 215; *Munday v. Vail,* 34 N. J. L. 418; *Spoon v. Coen,* 9 N. E. 132; *Becket v. Cuenin,* 25 Pac. 167 [Cal.]; *Young v. Rosenbaum,* 39 Cal. 654; *Sandoval v. Rosser,* 26 S.W. 935 [Tex.]; *Seamster v. Blackstock,* 2 S. E. 36; *Windsor v. McHugh,* 93 U. S. 274, 23 L. 914; *Bottman v. Supulvida,* 39 Cal. 688; *Sache v. Gillette,* 112 N. W. 387 [Mich.]; 11 Ann. Cases 348; *West v. Shurtliff,* 28 Utah, 337, 79 Pac. 180; 23 Cyc. 695, 669.) The reasons for written pleadings

43 Utah—38

are set forth in Bliss, Code Pleading (3 Ed.), Sec. 138; Phillips, Code Pleading, Sec. 356.

The doctrine of implication to support judgments will not be extended further than to defects of form and will not sustain a judgment in the absence of any pleadings. (*Woods Admrs. v. Woods,* Miner 45 [Ala.]; *Norfolk Co. v. Coffey,* 51 S. E. 729 [Va.]; *Rowan v. Givens,* 10 Gratt [Va.] 250; *Spoors v. Cowen,* 9 No. E. [Oh.].) Except in purely *ex parte* proceedings, or in cases between a plaintiff and some *res* which stands in place of a defendant, a judgment can only be rendered between adverse parties. (Black, on Judgments, Sect. 3; 23 Cyc. 669.) A judgment which does not show in whose favor or against whom it is given, is void for uncertainty. (Black, on Judgments, Sect. 3; 11 Ency. P. & P. 949, 951; *Turner v. Dupree,* 19 Ala., 198; *Gilbraith v. Manning,* 24 Ala. 198; *Fuller Co. v. Louis,* 50 Ills. App. 428; *Park v. Holmes,* 147 Pa. St. 497; *Ferrell v. Simmons,* 59 S. E. 751 [W. Va.].) If amount of judgment remains to be determined by a future contingency or is indefinite, the judgment is void. (Black, on Judgments, Sect. 3, 118; *Battell v. Lowery,* 46 Ia. 49; *People v. Pirfenbrink,* 96 Ills. 68.) The jurisdiction of a court is not exhausted by the rendition of a judgment but continues until the judgment is satisfied. (*Riggs v. Johnson Co.,* 6 Wall. 166; 18 L. 768; *Montomery v. Tuft,* 11 Cal. 190; *Shainwald v. Lewis,* 69 Fed. 487; *Gordon v. U. S.,* 117 U. S. 697.) A complaint may be filed after a final judgment for the purpose of fully enforcing it when some action has been taken or unforeseen event occurred which will prevent its enforcement unless a further judgment is given. (*Stainwald v. Lewis,* 69 Fed. 487; *Mitchell v. Big Six Co.,* 186 Fed., 552; *Wadhams v. Gay,* 73 Ill. 415; *Root v. Woolworth,* 150 U. S. 402; 37 L. 1122.) A court cannot of its own motion assume jurisdiction; some person must in some legal way invoke its action. (*Townsend's Succession,* 37 La. Ann. 114; *Gaber v. Douglas,* 64 Atl. 653 [Me.]; *State v. Muench,* 117 S. W. 25 [Mo.]; *Rudil v. Sawyer,* 122 N. W. 980 [Neb.].)

McCARTY, C. J.

On July 19, 1901, a decree was entered in the district court of Salt Lake County in an action brought to quiet the title to the waters of the Jordan River. That decree, among other things, provides that "the persons and corporations, parties to this suit, shall respectively construct or cause to be constructed at their own cost, and under the direction and supervision of the commissioner appointed by the court, proper appliances for the correct measurement of the waters awarded to them respectively, and thereafter shall maintain and keep in place dams, headgates, flumes, canals, penstocks, and other means by which said water is diverted, conveyed, or used in a good state of repair, together with appliances for the measurement of such water, to the end that no unnecessary loss from seepage or leakage shall occur, and that the water shall be economically applied to the uses for which it is awarded." The decree further provides that the court shall retain "original jurisdiction in this case and the subject-matter thereof and of the parties thereto . . . for the purpose of all necessary supplementary orders and decrees which may be required to make effectual the rights awarded and preserved by this decree." The decree also provides that, "for the purpose of carrying into effect this decree according to its true intent and purpose, J. Fewson Smith, Jr., is hereby appointed as a commissioner . . . to superintend and direct the measurement and division of all the water distributed by this decree in accordance therewith, to direct, supervise, and inspect all means and appliances for the diversion, conveyance, and use of the same, and to report from time to time to the court any violation of the provisions of this decree." The case was appealed to this court, and the decree affirmed. 24 Utah, 249, 67 Pac. 672, 61 L. R. A. 648.

In the year 1892 the Utah & Salt Lake Canal Company, the East Jordan Irrigation Company, and the South Jordan Canal Company constructed a dam across the head of the Jordan River, the outlet of Utah Lake, for the purpose of holding back the flow of the waters of the lake, and regulat-

ing the volume of discharge therof, and in connection there-
with installed a pumping plant at the point where the lake
empties into the Jordan River. This pumping plant consisted
of four pumps, each of which was and is capable of pumping
one hundred cubic feet of water per second of time. The com-
missioner, during the latter part of the year 1901, made cer-
tain improvements at the impounding dam of the Jordan
River, and installed a weir at a point in the river near the
power plant in what is known as the Jordan Narrows, and on
the 13th day of January, 1902, by consent of all the parties,
the court made a supplemental decree affirming the report of
the commissioner relating to such improvements, and as-
sessed the costs thereof in different amounts against each of
the parties to the original decree. In the year 1902, Salt
Lake City acquired a one-fourth interest in the pumps men-
tioned and the lands upon which they are located. In Jan-
uary, 1904, a contract was entered into between Salt Lake
City, South Jordan Canal Company, East Jordan Irriga-
tion Company, Utah & Salt Lake Canal Company, and the
North Jordan Irrigation Company, all parties to this pro-
ceeding, by the terms of which the North Jordan Irrigation
Company became the owner of a one-fifth interest in the
pumping plant and the lands upon which it is situated and
adjacent thereto. That contract, among other things, pro-
vided that:

"It is hereby expressly understood and agreed by the par-
ties to this contract that from this day (January 26, 1904)
the parties hereto are to be co-owners each of an undivided
one-fifth interest in said pumping plant. Nothing in this
contract contained shall in any manner bind any party here-
to to any specific expenditure in the future in relation to said
pumping plant save only the cost of maintenance and opera-
tion at its present capacity without the consent of said party.
It is expressly further understood and agreed between the
parties hereto that this contract or instrument is made solely
with reference to the pumping plant and property connected
therewith as hereinbefore described, and is not intended and
shall not be construed to in any way alter, change, or modify

the existing water rights or privileges of the parties hereto."
The pumping plant referred to was enlarged from time to
time by the installation of additional pumps to meet the re-
quirements and demands of Salt Lake City and the irriga-
tion companies mentioned for an increased supply of water,
and supplemental decrees were made and entered by the court
to meet the changed conditions, and for the carrying into
effect of the provisions of the original decree under such
changed conditions.

The relative locations of the respective points of diversion
of the waters of Jordan River by the several canal companies
are, approximately, as follows: Ten miles from the source
of the Jordan River is the intake of the East Jordan Irriga-
tion Company. At the same point, and on the other side of
the stream, is the intake of the Utah & Salt Lake Canal Com-
pany and the Telluride Power Company, hereinafter re-
ferred to as the Power Company. A mile farther down the
river is the joint intake of Salt Lake City and the South
Jordan Canal Company. A mile below the latter location is
the power plant of the Power Company, at which place the
waters utilized by it are required to be returned to the stream
or canals. Eight miles below the last location is the intake
of the Gardner Mill Race.

On November 17, 1910, the following motion was filed in
the cause by the Utah & Salt Lake Canal Company:

"Comes now the Utah & Salt Lake Canal Company, and
respectfully represents to the court that it is advised by J.
Fewson Smith, Jr., the commissioner of this court, that cer-
tain improvements are necessary in the Jordan River in or-
der that the waters thereof, to which the respective parties
to this action are entitled, may be properly and economically
distributed. Wherefore, the said Utah & Salt Lake Canal
Company moves the court that an order of this court issue
directed to J. Fewson Smith, Jr., the said commissioner,
and to each and all the parties to appear before this court,
at a time fixed in said order, and that then a hearing be had,
and that at the conclusion thereof the character of such im-
provements necessary, if any, be determined, fixed, and es-

tablished by order of this court, and that the proportionate part of the expenses of such improvements to be paid by each of the parties to this action be fixed and determined, and that a proper order be made as to the manner, and form, and time of payment thereof."

No petition or pleading other than the foregoing motion was presented to the court or filed in the cause to invoke the action of the court in regard to the subject-matter of the motion. On January 10, 1911, the matter came on for hearing, and counsel for the East Jordan Irrigation Company interposed an objection to the taking of testimony, which, so far as material here, was as follows:

"The East Jordan Irrigation Company desires to interpose a formal objection on the ground there is no issue before the court upon which testimony may be taken; upon the further ground there is no pleading in the case, original or otherwise, which justifies the proposed procedure."

The objection was overruled, and evidence was introduced showing the necessity of repairing the dams, weirs, and devices used in distributing the waters of Jordan River, and of making additional improvements to enable the commissioner theretofore appointed by the court to efficiently and equitably distribute the waters to the several irrigation companies and others entitled thereto. Before the taking of testimony was concluded, the court, with the approval of the parties to this appeal, temporarily suspended the proceedings, and appointed J. Fewson Smith, Jr., the commissioner, and two other civil engineers, namely, A. F. Doremus and Willard Cannon, as a board of engineers to personally examine the dams, weirs, and devices then installed, and to make such recommendations regarding the improvement of the system as they might deem necessary for the proper and equitable distribution of the waters mentioned. On June 8, 1911, the engineers filed their report, in which they recommended the making of improvements, such as dams, headgates, and measuring devices, such as they deemed necessary for the distribution of the waters. The report recited, and the evidence showed, that:

: "The devices now employed for measuring and diverting the water are old, inaccurate, and generally dilapidated contrivances that involve much labor and considerable risk in their operation. In most cases the measuring devices are situated from one to three miles below the head of the channel for which they are used to measure the water. This compels many miles of unnecessary travel between head of ditch and measuring device in order to determine and apportion the allotted flow."

After making those observations, the engineers specify and point out in their report what, in their judgment, would be proper devices, such as dams, weirs, and headgates, for measuring the waters, and distributing the same to the parties entitled thereto, and recommend that such devices be installed in and along the Jordan River at the intakes of the several canals diverting water therefrom as a "means (2) for accurately measuring the common water supply, (3) for equalizing and regulating the common flow, (4) for effective apportionment and diversion, (5) for measuring each individual ditch supply, (6) for regulating each individual ditch flow, and (7) for preventing damage by floods." And they further recommend that "all devices employed to meet these requirements should be durable, of reasonable cost, and the most effective and economical in operation." The report further recites that:

"To accomplish these results, the equipment should be carefuly planned, so that the various individual ditch devices will not only effectually perform their special functions, but at the same time constitute essential units of the completed whole, which should be as nearly as possible automatic' in its operations throughout. We recommend that such equipment should consist of the following units: (a) A principal dam in the river at the head of the system to serve (1) for impounding water in the river channel above to the extent needed to equalize the fluctuations in the flow of water from the lake; . . . (4) for supporting a substantial weir (at or near the intake of the East Jordan Irrigation Company's canal) to measure the flow of water into the sys-

tem below; and (5) for containing gates that can be opened for the passage of water in excess of that of the storage capacity of the lake, and for flushing out the basin of forebay immediately above such dam (the impounding dam)."

Continuing, the report recites that, in the judgment of the engineers, a dam and gates should be placed in the river at the several points of diversion below the weir above mentioned; that the devices mentioned in their report are "absolutely necessary to the common uses of the system, and. therefore advise that all should be provided at the common expense; and that the total cost thereof should be apportioned among the several canals and ditches of the system in the same proportions that the total commonwater supply is now apportioned among them."

When the report was submitted to the court, the East Jordan Irrigation Company made timely objections to its adoption. One of the grounds of objection was that certain recommendations made therein by the board of engineers would, if adopted by the court, be in conflict with the provisions, hereinbefore referred to, of the original decree. The court, for the time being, reserved its decision on the question raised by the objection, and permitted the parties to this appeal to introduce evidence as to the necessity of making the improvements and installing the devices recommended in the report of the engineers. After much evidence was introduced, all of which was without conflict, the court overruled the objections made to the adoption of the report, and entered an order approving the plans and specifications submitted by the commissioner, which seem to have been in conformity with the recommendations of the board of engineers, for the construction of dams, weirs, and devices mentioned in the report.

The court made findings of fact and conclusions of law and entered a decree which, in the main, are based upon and are responsive to certain agreements and stipulations made and entered into in open court by and between the parties to these proceedings. We deem it unnecessary to review or to

consider the findings and decree in so far as they are based upon the agreements and stipulations mentioned.

The findings of fact complained of by the appellants are as follows:

"(a) That Utah Lake, Jordan River, and appliances for the diversion of water from said lake and river into the canals constitute one complete and entire irrigation system. That, in order to properly regulate the flow of water in the Jordan River, so that the various parties may draw therefrom, with substantial accuracy, the quantity of water to which they are respectively entitled under said decree, it is necessary that certain controlling dams and devices, with proper weirs thereon and waterways therein, shall be constructed, particularly in the Jordan Narrows near the old Turner dam, near the intake of the Gardner Mill Race, and near the intake of the South Jordan and Salt Lake City Canals; and such devices are for the joint benefit of all parties to said action.

"(b) That a concrete diversion dam and measuring weir shall be constructed in the Jordan Narrows at or near the intake of the East Jordan and Utah & Salt Lake Canals, a concrete dam and measuring weir at the intake of the Salt Lake City and South Jordan Canals, and a concrete dam and measuring weir at the intake of the North Jordan Canal. at what is known as the Gardner Mill Race. That the design and general construction of said dams and measuring weirs should conform substantially to the plans and specifications prepared by J. Fewson Smith, Jr., and D. H. Blossom, copies of which should be filed with and approved by the court, prior to the commencement of the construction of said improvements, which should be made under the supervision of the commissioner of the court, and be prosecuted with reasonable diligence. That the cost and expense of the construction of said improvements should be borne by Salt Lake City, Utah & Salt Lake Canal Company, North Jordan Irrigation Company, and the Telluride Power Company in the following proportions, to wit:

Salt Lake City............................150/1098
Utah & Salt Lake Canal Company............246/1098
Eastern Jordan Irrigation Company..........170/1098
South Jordan Canal Company................142/1098
North Jordan Irrigation Company............120/1098
Telluride Power Company...................270/1098"

After the court had signified its intention of making and filing the foregoing findings of fact, and before the same were filed in the cause, the Utah & Salt Lake Canal Company filed written objections to the construction of the dams mentioned in the findings of fact. The third and fourth grounds of objection are as follows:

"(3) That the construction of the proposed dam with openings as planned below the level of the top of the 'old dam' will add to the expense of the construction of a diverting dam for the Utah & Salt Lake Canal Company without benefit to it.

"(4) It (the Utah & Salt Lake Canal Company) objects to the construction of the proposed dams and proposed channel changes in the Jordan River below the proposed upper dam so far as any portion of the cost thereof may be deemed chargeable against it. It is in no way interested in said dams and channel changes, and the same serve no purpose in diverting water into its canal."

The power company made the timely objections which were in effect the same as those filed by the Utah & Salt Lake Canal Company. The objections were overruled, and a decree in conformity with the findings made by the court was duly rendered. From the decree, the Utah & Salt Lake Canal Company, the Telluride Power Company, and the East Jordan Irrigation Company appeal.

Appellants contend that the court acted without jurisdiction in declaring (1) that the improvements mentioned in the findings of fact above set forth shall be made, and (2) that the cost and expense of constructing the same shall be prorated according to the respective interests of the parties in the waters of the Jordan River. The principal grounds urged against this portion of the court's decision are (a)

that it is not predicated upon any pleading in the cause, and (b) that it is in conflict with the provisions hereinbefore set forth of the original decree. On the other hand, it is earnestly contended by respondents that no part of the last decree is in conflict with the original decree; that the last decree was entered as a supplemental decree only to meet the changed conditions brought about since the entry of the original decree by the increased volume of water in the Jordan River during the portions of the irrigation season produced by the pumping of water from Utah Lake. In other words, they contend that the decree is merely supplemental to and in aid of the original decree.

Courts of equity undoubtedly have the power to make such orders as may be necessary to carry out and give effect to their decrees. (4 Pom. Eq. Jur. (3d Ed.) 1317.) In proceedings of this character, where no change or modification is sought, and the only effect of the proceedings is to carry out the provisions of the decree, and make them effective, a motion supported by affidavits setting forth the facts upon which the movement relies is ordinarily sufficient to invoke the action of the court. While this is the usual, and, as we think, the better practice, yet, where the parties to the decree appear in court, and evidence is introduced in support of and against granting the motion, as was done in this case, the failure to file an affidavit in support of the motion is not necessarily fatal to the proceedings. Where, however, a party to a decree seeks to have it changed or modified as to substance, his remedy is by a bill of review setting forth the facts upon which he relies for relief. (Story's Eq. Pl. section 338; 3 Ency. Pl. & Pr. 570, 571; 16 Cyc. 517.) It is vigorously contended on behalf of appellants that the decree entered in these proceedings cannot be upheld, because no pleadings were filed, and hence there are no issues upon which to base a decree. These proceedings were had in an action over which the court had, and for certain purposes still retains, jurisdiction. As hereinbefore pointed out, the court retained, and still retains, jurisdiction "for the purposes of (making) all necessary supplemental orders and decrees

which may be required to make effectual the rights awarded and preserved by the decree." In this proceeding the action of the court was invoked, not for the purpose of adjudicating property rights and conflicting interests of the parties pertaining to the subject-matter of the action, but to carry into effect the provisions of the decree. The pleadings forming the issues and the judgment rendered thereon, in which the property rights of the respective parties to the action are adjudicated, were, and will continue to be, sufficient to authorize any of the parties to the decree to invoke the jurisdiction and action of the court when necessary to carry out and make effectual the provisions of the decree. This is not, as counsel for appellants seem to infer, a proceeding to adjudicate the property rights between the parties to the action, but a proceeding in which the action of the court is invoked to preserve the rights which have been adjudicated by the decree. Therefore pleadings were not necessary to invoke the jurisdiction and action of the court in the premises. The filing of a motion by any of the parties to a decree inviting the court's attention to the particular matters or things necessary to be done in order to carry out and make effectual the provisions of the decree, and due service thereof on all the parties whose rights will be affected by the proceedings, is sufficient, and especially where, as in the case at bar, the parties appear in court, and take part in the proceedings.

Moreover, after the action of the court had been invoked, and evidence was being taken, the court, as hereinbefore stated, temporarily suspended proceedings and appointed the board of engineers mentioned. The report and recommendations made and filed by the engineers are very elaborate, containing a full and detailed statement of the improvements, and the general character thereof, that they **2, 3** deemed necessary at each point of diversion along the Jordan River to enable the commissioner to efficiently and equitably distribute the waters of the stream in accordance with the provisions of the original decree. The commissioner, J. Fewson Smith, Jr., prepared plans and specifications of the improvements recommended by himself and the other

members of the board of engineers and a statement of the estimated cost of the improvements recommended at each of the points of diversion. These plans and specifications, with a detailed statement of the estimated cost, were submitted to the court, and the commissioner was examined and cross-examined at great length by counsel of the respective parties to this appeal. It was this report, not the motion, upon which the proceedings were in effect had. No pleading, however perfect as such, could contain a more complete and lucid statement of the facts of the subject-matter of inquiry than was contained in the report and recommendations made by the board of engineers, supplemented, as the report was, by the plans and specifications of the improvements and the estimated cost thereof submitted to the court by the commissioner. The parties were not, as has been suggested, left to grope in the dark, and to surmise and conjecture as to what was really before the court for investigation, or the purposes thereof. On the contrary, they were advised of and fully comprehended the purpose of the proceeding and the scope that it would probably take. After the report of the engineers was filed, Salt Lake City, one of the plaintiffs in the action, filed a notice which, so far as material here, is as follows:

"To the Defendants and Interveners in the Above-Entitled Action, and the Respective Attorneys:

"Please take notice that on a hearing of all undisposed-of matters in the above-entitled action, before Hon. C. W. Morse, Judge, on Tuesday, the 9th day of April, 1912, at 10 o'clock a. m., or as soon thereafter as counsel can be heard, the plaintiff Salt Lake City will move the court to consider and determine the following undisposed-of pending matters in said cause, to wit: (1) What, if any, improvements recommended in the report of Commissioners A. F. Doremus, Willard T. Cannon, and J. Fewson Smith, Jr., heretofore filed herein, shall be made, and the time for making the same, and how the expense thereof shall be apportioned."

In response to this notice, appellants and other parties to the action appeared in court, and took part in the proceed-

ings. The court having jurisdiction of the subject-matter of the action, the parties, by appearing in court, and taking part in the proceedings, waived whatever defects, if any, there were in either of the notices because of the failure to recite more fully therein the matters which the action of the court was invoked to consider.

Let us assume for the sake of argument that, because of the importance of the questions involved, some document in the nature of a pleading setting forth in detail the matters to be considered by the court should have been filed in the first instance. The record conclusively shows **4** that appellants were not prejudiced because this was not done. Nor were they, or either of them, prejudiced because of the informal manner in which the proceedings were conducted.

While the motion upon which these proceedings were inaugurated is not as broad and comprehensive in its recital of facts as it should be, and especially so as no affidavit setting forth the facts was filed in support of the motion, yet we think appellants are estopped from assailing or challenging the provisions of the decree which are not in conflict with and in no way antagonistic to the original decree. The motion upon which the action of the court was invoked and these proceedings were had was filed by appellant the Utah & Salt Lake Canal Company, and its counsel, the author of the motion, during the proceedings repeatedly in open court expressly waived the filing of pleadings. This waiver was, at least tacitly, acquiesced in by the other two appellants. On one of these occasions, counsel said:

"I don't care about any formal pleadings. I don't think there is any need of any. I think the request of the commissioner is enough to set the case."

On another occasion he said:

"So far as I am concerned, on behalf of the Utah & Salt Lake (Canal Company) I stipulate the decision in this case may be made on the facts submitted to the court, taking into consideration all the legal rights as shown by the evidence as to any and all of the parties concerned, the same as if each

and every legal right upon which there is evidence has been set forth fully in the pleadings."

In response to the foregoing statement, counsel for appellant the East Jordan Irrigation Company said:

"I will supplement that on behalf of the East Jordan to this extent, that such contracts as have been read into the record as your honor may desire to have transcribed by the reporter for reference may be transcribed at the expense of the parties."

Later on in the proceedings, counsel for appellant the Utah & Salt Lake Canal Company said:

"We will concede, as a matter of law, that the court has the power reserved at this time. Questions of what shall be done, cost, and how it shall be paid for, the court has the power, as a matter of law, under the decree, to order that suitable measuring devices be put in these two places."

One of the "places" referred to by counsel is the Jordan Narrows, at or near the intake of the canals of the East Jordan and Utah & Salt Lake Companies. The assignment of error in which the decree is assailed on the ground that it is not based upon issues made by proper pleadings is overruled.

The original decree, as hereinbefore stated, provides that the parties to the suit shall respectively construct and maintain, or cause to be constructed and maintained, "at their own cost, and under the direction or supervision of the commissioner appointed by the court, proper appliances for the accurate measurement of the waters awarded to them respectively;" and, as stated, the decree further provides that "original jurisdiction of this cause, and the subject-matter thereof, and the parties thereto, is hereby retained for the purpose of all necessary supplementary orders and decrees which may be required to make effectual the rights awarded and preserved by this decree." The evidence, without conflict, shows that the dams, weirs, and appliances that have been and are now in use are inaccurate and inadequate for the proper distribution of the waters in accordance with the terms of the decree, and the undisputed evidence shows that the commissioner and his assistants are obliged to

incur considerable danger in regulating and distributing the waters under present conditions. On this point the commissioner testified, and his testimony is not disputed, in part as follows:

"The old dam must be renewed. It is impossible to operate any longer with it in its present condition without danger to the life of the man who tries to make any diversion there. . . . The old Turner dam which is used for diverting water into the Utah & Salt Lake Canal, and for passing everything that belongs to all other parts of the system except the East Jordan Canal, . . . is dangerous. . . . It is risky for one man to handle the headboards on the top of the platform under the condition that dam is now in. If a man gets in there he is very apt to drown."

The evidence also shows, in fact it is in effect conceded, that some of the parties to the decree get more water than they are entitled to receive under the decree, and that this inequality in the distribution cannot be obviated under present conditions. Appellants, in their briefs, say:

"It may be true some irrigation companies have at times been getting more water and others less than the original decree specified to be the carrying capacity of their canals. . . . It may be true that at times both the Utah & Salt Lake and East Jordan, for intermittent periods, get more water than they are entitled to."

The undisputed evidence shows that the improvements referred to, if made, would enable the commissioner to overcome these obstacles, and to properly and economically distribute the waters substantially as provided for in the decree. On this point the commissioner testified, and his testimony is not disputed, as follows:

"The structures I proposed will enable us to practically overcome the principal variations and fluctuations. In my opinion, I think we could regulate the flow of the water with substantial accuracy with these appliances. I do not know of any other appliances or any other way that those appliances can be constructed that would combine the elements of efficiency and be substantial."

We are of the opinion, and so hold, that the court, under the facts and circumstances as shown by the record, was fully warranted in ordering and decreeing that the improvements be made in accordance with the plans and specifications submitted by the commissioner and recommended by him, and that it did not exceed its jurisdiction in so doing.

We now come to the questions presented by the assignment directed to the findings of fact and decree, wherein it is held that the improvements mentioned are for the "joint benefit of all the parties to said action," and that the cost of putting in and maintaining the improvements should be borne by the parties to the action according to their respective interests in the waters distributed. The record shows, and the court found, that Salt Lake City, Utah & Salt Lake Canal Company, the East Jordan Irrigation Company, and the North Jordan Irrigation Company have a common interest in the impounding dam and in the pumping plant. Counsel for appellants discuss and criticize the court's findings regarding the circumstances and conditions under which the pumps may be put in operation each year, and the basis upon which the cost of starting and operating them shall be prorated among the parties benefited thereby. We think it sufficient to here state, without reviewing the evidence bearing upon this question, that this assignment is without merit, and is therefore overruled. It is conceded that the dam near the intake of the canal of the Power Company and the Utah & Salt Lake Canal Company and the intake of the East Jordan Company canal, and referred to in the evidence as the "main" dam, is used, not only as a diverting dam for these canals, but that it is also used and is necessary to measure and determine the amount of the flow of the river over the dam to the appropriators down the stream. This dam and weir being for the joint benefit of the appellants and of Salt Lake City, South Jordan Canal Company, and the North Jordan Irrigation Company, the court held, and, as we think, correctly, that the cost of their construction should be pro-

43 Utah—39

rated between the parties, and that each party should pay in proportion to his interests in the stream. The Power Company, however, takes the position that it ought not to be required to pay any portion of the cost of constructing and maintaining this dam, on the ground that it does not, so it contends, "receive any substantial benefits therefrom." Its counsel, in their printed briefs say:

"If there is to be any equity in the apportionment of these costs, it must be on the basis of benefits received, and not on a mere possibility. To the extent to which the parties use these improvements, they should pay therefor. That seems to us to be the only fair basis upon which to divide these expenses. And if the Power Company does not actually receive any substantial benefits therefrom, . . . it should not be required to pay any of the costs thereof."

The commissioner testified, and his evidence is not disputed:

"If the Telluride Power Company has the right to use the water of the South Jordan Canal under the decree, that water would have to be taken through the Utah & Salt Lake Canal, and would require a sufficient diversion dam to turn, not only the water to which the Utah & Salt Lake Canal is entitled, but also the quantity the Telluride Power Company might have the right to use of the South Jordan water. The same is true of the North Jordan water and the City water. . . . The improvements here suggested take that into consideration."

Further along in his testimony he says:

"If the city, prior claimants, and the North Jordan are using the water, the Telluride Power Company cannot get all the water it sees fit on account of the incapacity of the canal to carry it. Leaving that out, there is no reason why they can't get it. It depends entirely upon their providing means of using it. I know of no reason why it is not under their control, if they see fit to exercise it."

The extent of the power company's right to the use of the water for power purposes is determined and fixed by the original decree as follows:

"The Power Company is the owner of and entitled to the right to use all the water of Jordan River flowing in and through the channel thereof, at and above a point on said river where the power plant of said company is situated, to the use of which the several persons and claimants diverting the water of the river north and below the said power plant are entitled as appropriators, with fixed and primary rights, as awarded by this decree, and to convey such water to its power plant for use in the operation of the same, and to deliver the same, after such use, back into the river . . . at a point opposite the place of the use by the said company."

The decree also specifically provides that the Power Company also has the right to the use "in the same manner," for operating its power plant, the water awarded by the decree to the South Jordan Canal Company and to Salt Lake City. The evidence shows, in fact it is conceded, that the Power Company has two wheels in its plant, and that it requires from "between eighty-six and 100 to 120 second feet of water to operate each wheel." That is, to operate both wheels at the same time, it requires approximately from 200 to 240 second feet of water. In other words, the maximum amount of water required to operate the power plant to its full capacity is 240 second feet. The Utah & Salt Lake Canal Company has decreed to it 246 second feet of water. The carrying capacity of this canal is 300 second feet only. Because of the limited carrying capacity of the canal, the Power Company is, and has been, unable to run more than one wheel at a time, and hence has not at any one time used to exceed 120 second feet of water. The Power Company, nevertheless, under the decree, has the right to the use of sufficient water (240 second feet) to run its plant at its full capacity, and, whenever it provides the necessary facilities for carrying the water to which it is entitled from the dam in question by enlarging the Utah & Salt Lake Canal Company's canal, or otherwise, the commissioner will, under the decree, be required, if requested so to do, to distribute this amount of water to it. It is nowhere suggested or intimated in the record that the Power Company has any

intention whatever of disclaiming or abandoning any portion of its right to the use of the water decreed to it. For aught that appears in the record the Power Company may at any time provide the necessary means for carrying the amount of water (240 second feet) necessary to operate its power plant to its full capacity. We therefore know of no good reason, and certainly none has been suggested, why the Power Company should not be required to contribute to the cost of constructing and maintaining the dam in question in proportion to its maximum right to the use of water. But in the apportionment of costs it ought not be assessed and required to pay for water that it does not need and cannot possibly use. Under the undisputed facts the Power Company, in the apportionment of the costs of the construction of the dam and weir in question, should be assessed for 240 second feet of water only, instead of 270 second feet as found by the court. The court, therefore, erred in its apportionment of the costs and expenses in that regard.

Appellants object to the construction of that kind of a dam recommended by the commissioner and found by the court to be proper and suitable for measuring and partially distributing the water at that point, on the ground that it will be a much more expensive dam than the necessities of the situation demand. The estimated cost of the dam is $12,180. We do not think that, under the facts and circumstances as disclosed by the record, the court exceeded its power, or abused its discretion, in ordering the improvements as planned, and recommended by the commissioner. Up to this point we think the court clearly acted within the powers retained by it in the original decree. But there is no evidence whatever in the case which sustains, or tends to sustain, that part of the decision wherein it is held that the construction of a "concrete dam and measuring weir at the intake of the Salt Lake City and South Jordan Canal, and a concrete dam and measuring weir at the intake of the North Jordan Canal, at what is known as the Gardner Mill Race," would be "for the joint benefit of all the parties to said action." As hereinbefore pointed out, the intake of

the Salt Lake City and South Jordan Canal is approximately one mile, and the intake of the North Jordan Canal is ten miles farther down the stream than the intakes of the canals of appellants. We have carefully examined the record, and have considered every phase of the question urged and discussed by counsel in their oral arguments and in their printed briefs, and we fail to see, and are unable to conceive of, any benefit whatever, either directly or indirectly, that would inure to appellants, or either of them, by the construction of dams and measuring devices in the river channel below where the stream passes the intakes of their canals. The finding, therefore, cannot, upon any legal or equitable principle, be upheld. Neither can that part of the decision be sustained in which it is held that the cost of the construction of the dams and measuring weirs last mentioned shall be prorated between the parties to the action according to their respective interests in the waters of the Jordan River. The decree in that regard is in conflict with and in effect nullifies certain parts of the original decree herein set forth, wherein it is provided that the parties to the suit "shall respectively construct or cause to be constructed at their own cost . . . proper appliances for the correct measurement of waters awarded to them respectively, and thereafter shall maintain and keep in place dams, headgates, flumes, canals, and penstocks, and other means by which said water is diverted and used." Respondents contend with much earnestness that this part of the decree was entered by agreement of the parties, and at the urgent request of appellants. This, we think, is true as to the Utah & Salt Lake Canal Company; but the record shows that the East Jordan Irrigation Company repeatedly, during the proceedings in the lower court, objected to having any portion of the cost of the construction of the improvements in the river below their diverting dam assessed against it, and the Power Company objected to paying any portion of the cost of the construction of the contemplated improvements, regardless of where, or at what point on the river, they may be installed. And we fail to find anything in the record that is susceptible of being con-

strued as an agreement or even as an acquiescence on the part of these two appellants, or either of them, that that part of the decree apportioning costs should or might be entered.

The cause is remanded, with directions to the trial court to set aside that part of the findings of fact, conclusions of law, and decree in which the costs of improvements mentioned are apportioned between the parties to these proceedings, and also that part in which appellants are required to pay a portion of the cost of the improvements made in the river below the diverting dam at the intakes of their canals, and to make findings thereon, and to enter judgment in accordance with the views herein expressed. Each party to this appeal to pay its own costs.

FRICK, J.

I concur with the Chief Justice. In view, however, of the able dissenting opinion of Mr. Justice Straup, I desire to briefly state a few of the reasons which impel me to arrive at the conclusion aforesaid.

I fully concur with Mr. Justice Straup's statement and conclusions as abstract propositions of law; but in my judgment they are not applicable, and it would be unjust to apply them in this case in view of the whole record. There can be no doubt that the trial court had jurisdiction of the subject-matter, of the subject of the particular proceeding, and of the parties. Such jurisdiction was specifically retained in the original decree entered in this action in 1901 as pointed out in the opinion of the Chief Justice, and it was so retained for the express purpose of making "all necessary supplementary orders and decrees which may be required to make effectual the rights awarded and preserved by this decree." This means, if it means anything, more than merely to retain jurisdiction for the purpose of the enforcement of the judgment or decree, which every court retains as a matter of right. Let me ask what order or decree is approved by the Chief Justice, except such as is clearly comprehended within the foregoing reservation found in the original decree?

Again, can any one doubt that, in order to enforce the true spirit and intent of the original decree, had it become necessary to make the orders in question and as sustained by the Chief Justice as part thereof, that such orders could not have been made a part thereof without any further pleadings in the case? Are not such matters, however complex, merely incidental to the right to appropriate, divert, and use the waters of a stream or system, which right is to be enjoyed in connection with others who may have rights to the use of water flowing in the same stream or system? Suppose the action had been brought to determine and fix the rights of all the appropriators of water from the Jordan River, and the court had found, and in the decree had declared, those rights, and had also determined at what points, and how often, and in what amounts, and by what means each appropriator should divert his water from the waters flowing in the stream; could not the court, as a mere incident to the determination of such rights, also have determined the kind and character of the necessary diverting appliances, and fixed the cost thereof, without special pleadings or any special statement in the pleadings setting forth just what these things should consist of, and at what point or points they should be placed? I, at least, entertain no doubt but that the court could have done all of these things as merely incidental to the principal thing, namely, the determination and fixing of the rights to the use of water. If I am right thus far, then the court in the present proceeding could also do these things without special pleadings, and what it did in that regard, however informal or erroneous, would, nevertheless, not be open to the objection that the court acted without jurisdiction. While it is quite true that under our jurisprudence a court is not an autocrat, and can only award relief according to the forms of law and procedure, yet, when the court's powers are once set in motion in a particular proceeding in a proper manner, whatever the methods pursued may be called, subsequent errors and departures from the regular course of procedure, although gross, do not rob a

court of general jurisdiction of its powers, and make its actions in the premises void.

The record in this case conclusively shows that all the parties affected by the decree had their day in court. It shows that the proceedings in question were pending, and hearings were had, from time to time covering a period of almost two years. During that time numerous stipulations, oral and written, were entered into by the parties, and some special matters were from time to time referred to special experts, and the reports made upon the matters so referred were all submitted to protracted hearings before the court, and before they were approved by it. Not only is it apparent from the record that the parties, with the exceptions stated by the Chief Justice, were willing to and did proceed without special pleadings or statements of any kind, but the record further shows that such has been the course of procedure in this case ever since the original decree was entered. At various times since 1901 the district court has been called on to make "orders or decrees" which were deemed necessary for the more equitable and better enforcement of the terms of the original decree. These orders involved the expenditure of thousands of dollars, and, if it be now held that the orders in this proceeding are void for the reasons stated by Mr. Justice Straup, then it unavoidably follows that practically all of the orders made subsequent to the original decree are void and of no force or effect for the same reasons. To so hold would unavoidably lead to turmoil and endless litigation. This should be avoided, if avoidance be possible under the forms of law. Moreover, the record, in my judgment, is all but conclusive that, if the decree is modified as directed by the Chief Justice, none of the parties to the action is or can be prejudiced in any substantial legal right. If the court had jurisdiction, therefore, no cause for reversing the entire decree and again setting the case at large exists. Again, if it were necessary to have pleadings for the purpose of completing a proper judicial record, an order to supply them could be made *nunc pro tunc*. While this could be done as to the nonobjecting parties without question, it, in my judg-

ment, under the circumstances of this case, may also be done
as against the objecting parties for two reasons:  (1)  'Be-
cause the decree, to all intents and purposes, has been
modified to conform to their objections which were proper;
and (2) after the decree is so modified, neither of the object-
ing parties will be affected in a substantial right, if plead-
ings, or any other necessary statements, are permitted to be
filed *nunc pro tunc* for the purposes aforesaid.  Not only will
the objectors not suffer in any substantial right, but, if
pleadings are necessary to make a complete judicial record,
they, as all other parties, will be benefited, since their rights
under the original decree will all the better be preserved.
But it is vigorously insisted that, although it be conceded
that the court had jurisdiction of the subject-matter and of
the parties, yet it did not have the power to make the findings
and decree in this proceeding, because its judicial powers
have not been properly invoked.  This, it is contended, is so
because the motion was utterly insufficient to set in motion
the court's powers.  As a basis for this contention, it is
pointed out that the findings and decree include a multitude
of things.  Let it be conceded that the findings and decree
do cover all of the things enumerated by Mr. Justice Straup,
and yet my conclusions, in my judgment, are not at all
affected thereby.  None of the things mentioned were really
litigated or contested matters, but were merely incidental to
the only question that was before the court for determina-
tion, namely:  Should the court order different diverting
and measuring appliances to be installed, in order that the
waters of Jordan River might be more equitably and justly
measured and distributed among all of the appropriators and
users thereof?  All of the facts found by the court were so
found as the basis for the order or decree that, in order to
accomplish the purposes of the original decree, such ap-
pliances were necessary at certain points on the stream, and
hence should be installed.

I think it cannot be doubted that it was necessary for the
court to hear evidence upon all of the matters found by it in
order to arrive at a just conclusion with respect to the only

question litigated, namely, the necessity of installing new diverting and measuring appliances. But it was not necessary, nor was it intended by making those findings, to settle, adjudicate, or determine any of them, because those matters had all been settled and adjudicated in the original decree, and by orders and decrees made subsequent thereto, and before this proceeding was instituted. As already stated, therefore, these matters were purely incidental. I am of the opinion, therefore, that the motion, although quite informal, was, nevertheless, sufficient to properly invoke the powers of the court, and especially so in view that the court always had jurisdiction of the cause for the very purposes that the framer of the motion had in view in presenting it to the court. If, therefore, there is any defect in the motion at all, it is merely one of defective statement, and not one which is entirely lacking in substance, and therefore of no force or effect. Courts, in the administration of law and justice, may not lose sight of the utilitarian and practical side of things. All rules, excepting those which confer jurisdiction, should always be liberally construed and applied when such is necessary in furtherance of justice. And under some circumstances even jurisdictional matters should not be too strictly invoked. To now set aside the whole decree, and again set the whole matter at large, could result only in injustice, for the reason that it would entail a very large and unnecessary expense upon both public and private interests, without any corresponding good whatever. As I view the matter, the district court had full and complete jurisdiction to hear, determine, and declare the matters covered by the findings and decree, with the exception of those things that are modified as pointed out in the opinion of the Chief Justice. The order or decree should therefore as modified be affirmed.


STRAUP, J.

I concur in that part of the order reversing the judgment, and dissent from that affirming it.

Let it be conceded that the court, when its action was properly invoked, had power as claimed to make such supplemental and additional orders in the premises as were necessary and proper to give effect to and execute the original decree, the judgment of 1901; yet I am of the opinion such action was not properly invoked, especially not to hear or adjudge what was attempted to be adjudged as shown by the findings and the supplemental decree. Though it should be further conceded that the party invoking the action, and the parties proceeding without objection, and with consent, as though pleadings of some kind had been filed, and issues presented, may not complain, still, how stands the matter as to those who timely and properly did object?

A judgment in a case of numerous parties was entered in 1901, whereby the ownership in severalty of the parties in and to the use of the waters of Jordan River and Utah Lake, and the quantity thereof to which each was entitled, were defined and decreed, and, among other things, their rights and obligations fixed with respect to the construction and maintenance of measuring and diverting appliances, dams, headgates, flumes, canals, etc., and the payment of costs and expenses connected therewith. Nine years thereafter one of the parties, one of the appellants here, the Utah & Salt Lake Canal Company, filed in that cause a written notice, the first notice set forth in the opinion of the Chief Justice, and upon that, and nothing else, invoked the action of the court, and obtained an order requiring all the parties to appear. Now, I care little what the thing filed is called, whether a complaint, petition, statement, affidavit, notice, or some other name, or the remedy pursued, whether by supplemental and additional proceedings in the original case, or by a new bill, or by some original proceeding. Still the thing filed, whatever name may be given it, or whatever remedy may have been pursued, must have substance to properly invoke action and power of the court to hear, try, and adjudicate. Though formal pleadings were not necessary, yet something of substance was essential to properly invoke such action, and to invest the court with jurisdiction to proceed.

How was that action and jurisdiction invoked? By the filing of the written notice. What matter of substance does it contain? The only similitude of anything of substance—the only allegation or statement—is that the party filing it was "advised" by the commissioner "that certain improvements are necessary in the Jordan River, in order that the waters thereof to which the respective parties to this action are entitled may be properly and economically distributed." Upon that an order was asked and obtained that all the parties be ruled in, "the character of the improvements determined," and the "proportionate part of the expense fixed." What, therefore, by that notice, and upon which such order was asked and made, was presented for judicial consideration and determination? That the party filing the notice was advised that certain improvements in the river were necessary. It is not stated or alleged that they were necessary or ought to be made, nor are they in any particular identified, described, or characterized. Nothing could be more indefinite, more general, or nameless. True, the party filing the notice repeatedly, during the trial, asserted and proclaimed, as did some of the other parties, a waiver of pleadings, issues, everything, and urged the court on to hear anything and everything offered, and, like the mariner without rudder or compass, went splashing on without let or hindrance. Though the court, for want of pleadings or issues, or something defining and restricting judicial inquiry, at different times during the proceedings questioned its power to proceed, nevertheless it was urged on by all of the parties except two of the appellants. The inquiry took a wide range, involving about everything relating to the irrigating system, and to the use, diversion, and distribution of the waters of the river, except the appropriations and the rights of the respective parties in and to a beneficial use of the waters and the quantity thereof to which each was entitled. Those matters were left undisturbed as fixed by the decree of 1901. Nowhere were the investigations limited or prescribed until they were stated by the court in the findings. The findings and conclusions are lengthy, covering twenty-

one printed pages; the decree ten. By them the court decreed and adjudged the ownership of a large and expensive pumping plant at or near the source of the river, and the respective rights of the parties therein and thereto, when and under what circumstances it could be operated, the manner of its control and operation, the ownership of lands, easements, appurtenances, and rights of way, the diversion, distribution, and control of the waters of the respective parties, the kind and number of impounding, and diversion dams, measuring weirs, diverting and controlling devices along the river, the payment and apportionment of costs and expenses for the construction, operation, and maintenance of them, and the payment of damages occasioned by overflows and inundations.

Two of the appellants, however, the East Jordan Irrigation Company and the Telluride Power Company, at the very threshold, made timely objections, on the ground that there were no pleadings or issues with respect to which evidence could be received, and that the court, for that reason among others, was without jurisdiction to proceed to trial. These objections were overruled. And during the trial counsel for these parties, upon these grounds, at different times, objected to testimony offered, and, when the report of the commissioners was about to be received in evidence, the court inquired of counsel.

"Is there any of the parties that object to the court entering upon the consideration of having these improvements made?"

Counsel for the East Jordan Irrigation Company answered that they did object upon the grounds theretofore stated, and upon the further ground that to order the improvements, and to apportion the costs therefor, would be in violation of the decree of 1901. But the court overruled the objections, and proceeded. On the record I do not see anything to justify the conclusion that these parties waived anything. Clearly, as to them, the judgment is bad.

But how about the claimed waiver of the other appellant, the party invoking the action of the court? If a proceeding,

for want of some sort of a pleading, issue, statement, something of substance—I do not care what it is called—to invoke action of the court, and to authorize it to hear and try some nameless and indescribable thing presenting no matter of controversy and no point of fact or law whatever for determination, is waivable, then has this appellant waived it, and ought it to be held to the waiver, if the law permits it. But I do not see on what principle such a holding can be made, for the waiver goes directly to substance and to jurisdiction. It is fundamental that what is not juridically presented cannot be judicially decided; that pleadings of some sort, a complaint, petition, affidavit, statement, notice, something of substance, presenting some sort of issue either of fact or law for adjudication, are the juridical means of investing a court with jurisdiction of the subject-matter to adjudicate it. How often have we heard it said that pleadings, allegations, or statements of some sort are essential to jurisdiction; that what ought to be of record must be proved by record, and by the right record; that, if there is no issue, there is no authority to try; that a court cannot act without its record, and, if it does, its acts are *coram non judice*; that a judgment without allegations is void, and subject both to direct and collateral attack, for, when the foundation fails, all goes to the ground; and that a judgment rendered where no cause has been stated is as much a judgment *coram non judice* as one rendered on a case perfectly stated before a court not clothed with jurisdiction to hear and determine it. In harmony with this is the Code that objections to the jurisdiction of the court, and that no cause of action is stated, are not waived by failure to make them on demurrer or by answer, and are the repeated holdings of courts under it, that these objections are always available both on direct and collateral attack. There are many things pertaining to the formal or adjective law which parties may waive. They may as to matters personal to themselves override the law, and stipulate one for themselves. They may acquiesce in error, and by acquiescence avoid its effect. But matters of substance cannot be waived. These need neither objection, ex-

ception, nor assignments of error. With respect to them, courts *sua sponte* open the record and take notice of defects of substance without regard to the wishes of either party named on the record. Again, how often do we read that the judgment record must stand the test of a general demurrer which, at all its stages, and by whatever name called, whether motion, demurrer, motion in arrest of judgment, or *non obstante veredicto,* or of repleader, review in appellate procedure, or requirements to resist objections on collateral attack, or requirements for *res adjudicata,* attaches to substance or the state's substantive law, which cannot be waived. The public, the sovereignty, the state, requires and demands *a coram judice* proceeding. No other suffices; no other will be recognized. The state gives much freedom to suitors to stipulate a law for themselves as to matters personal to themselves; but it has not given them the right to waive or contract away what concerns the state itself, *coram judice* proceedings. As to that the state cannot be foreclosed by the compact or conduct of the parties named upon the record. Hence the Code that, by failure to demur, and by answering a party, waives many things of formal or adjective law, but not jurisdiction of the court, nor sufficiency of the pleading or thing filed to invoke the action of the court, and to invest it with jurisdiction to hear, try, and adjudge. Courts under the Code cannot, any more than they could at common law, or in equity, sit as a godfather over suitors, granting to or withholding from them whatever may seem to the court just and proper. They cannot choose their cases. They can only decide those and the matters therein involved which the parties have presented by their statements of the cause of action and ground of defense. I use the term "cause of action" in the broadest sense; any right which a party has to institute and carry through a proceeding, whether original or supplemental, resulting in a judgment, that foundation which every judgment must have to support it. If a judgment ever was void for want of a statement or allegation, a foundation to support it, void because no jurisdiction was conferred upon the court to hear, try, and render a judgment, then is this

judgment a nullity. That is self-evident when the notice, the thing filed to invoke the action of the court, and to invest it with power to hear and try something, is compared with the findings and the judgment, the matters presented with the matters adjudicated. The notice presenting not even the slightest similitude of an issue either of fact or law, the comparison is one of nothing with that of something requiring thirty printed pages to state it. And on that foundation—nothing—rests the judgment complained of.

True, the respondents contend that it also rests on the original pleadings of the cause. No doubt many orders and some judgments, made or rendered as the result of proceedings supplemental or additional to an original decree or judgment in the same cause, may be supported by the original pleadings in that cause. Whether they have such support is dependent upon the contents of the original pleadings, and the matters adjudged both by the original judgment and by the supplemental or additional order or judgment. But from mere inspection it here is manifest that the supplemental judgment has no support from such a source. The adjudication here made by the supplemental judgment constitutes a complete and independent judgment or decree based on full, complete, and independent findings. In such respect the findings, conclusions, and the judgment are as full and complete as required in any original or independent action. A comparison of them with the original judgment record shows modifications and annulments of material portions of the original judgment, and adjudications not within the issues of the original pleadings. Surely the filing and presentation of the notice did not invest the court with any such power, nor apprise the parties of any such contemplated action. The case as presented by the original pleadings was not partly but wholly tried, and was fully and finally adjudicated on all the issues presented by the original pleadings nine years ago. They support that judgment, not this. The issues presented by them were then properly tried, not now. In this connection do the respondents also say that these proceedings were but in aid of the original decree, and to

give effect to it, and were had in pursuance of a power or continuing jurisdiction retained by the court under the original decree. Let it be assumed that that was the intention of these proceedings, and that the parties, or some of them, had some right or obligation which, to assert and present, did not require a fresh or independent action, but could be presented, and judicial action invoked upon it, under the claimed continuing jurisdiction of the court; yet how did the court, nine years after the original decree, get jurisdiction to hear and adjudicate the particular matters and things here heard and adjudicated? Though the court retained and possessed a continuing jurisdiction, its powers, nevertheless, were not wound up and set like an alarm clock to automatically go off every irrigating season or every nine years. Notwithstanding such continuing jurisdiction, a presentation of allegations, or a statement of some kind as to the nature of some right, or obligation, or matter for judicial inquiry, was, nevertheless, essential to properly invoke the court's action, and to invest it with power to further hear, try, and adjudicate. That is, to invoke such action, the parties, nevertheless, were required to present something to the court to hear, try, and adjudicate, and concerning which the proceedings and trial resulted in the judgment here rendered and complained of. That something was the notice which is nothing.

It is further contended that the report of the commissioners, which was received in evidence, and incorporated in the bill of exceptions, may be regarded as something presenting issues or matters for judicial inquiry and determination. I think not. The notice on which these proceedings were instituted was filed in November, 1910. The hearing began in January, 1911. After it had been carried on, off and on for several months, much testimony given, the commissioners and other witnesses examined and cross-examined, and much other evidence adduced, respecting the subjects upon which findings later were made, and after the case had thus been partly tried, and upon divers contentions being

43 Utah—40

made by counsel in argument concerning the improvements and the apportionment of the costs therefor, the court observed:

"I will hear from all the parties with reference to that apportionment after we have determined what is to be constructed. Gentlemen, I will do this: I will ask Mr. Smith (the commissioner), and I will have some one associated with him, to make some estimates and computations to submit to the court at some future day, and I will fix the time, and notify all of the parties interested, so that they can be here and consider that report."

Thereupon the court appointed the commissioner and two others, all of them civil engineers, to make a report, and the further hearing subject to future notice continued indefinitely. Later, in June, 1911, a report was made which, on a further hearing, was, over the objections of two of the appellants, put in evidence, and further evidence adduced. The hearing was then again continued, and finally, in April, 1912, Salt Lake City served the notice referred to by the Chief Justice for a resumption of a further "hearing of all undisposed of matters in the above-entitled action," and respecting improvements recommended by the commissioners. A further hearing was had, the commissioners further examined, and further evidence adduced.

I cannot regard that as anything presenting issues. The report was not anything alleged, asserted, or presented by either party. I have already observed that courts cannot choose their cases, nor present the statement of the cause of action or ground of defense, the matter for judicial inquiry. Neither can they delegate that to a commissioner or other officer of the court. The parties, and they alone, must present the issue, the right, the obligation, the matter, whatever it may be, for judicial inquiry and determination. The report was made and received in evidence to aid the court in arriving at findings and conclusions. As such, I think, portions of it were properly received; much of it, however, was not even proper for that purpose. But I cannot regard it as performing any function other than evidentiary. It has no

semblance of anything presenting allegations or issues of any kind, or of any jurisdictional element or juridical means investing the court with power to act, hear, try, and adjudicate. It is fundamental, and as true now as when first declared many years ago, that jurisdictional facts must arise from pleadings, a document of some sort containing allegations or statements of some substantive right or obligation invoking judicial action. It matters little how simple it is, or what it is called; but it must have sufficient substance to support not only a judgment but the judgment rendered. These jurisdictional facts must appear on the face of the judgment record. They cannot be gathered from the evidence, commissioners' reports, or other evidentiary documents. Even judicial recitals of them in the judgment will not suffice. They must appear elsewhere and in the right document and right record.

When it is said a good judgment must bear the search and stand the test of a general demurrer by whatever name called, what does that mean? Sufficiency of evidence to support the judgment? Sufficiency of some report made during the trial and put in evidence, or of plans and specifications or other documents put in evidence, or of motions served and filed during the progress of the trial, things which are not even part of the judgment roll, and of which we only have judicial knowledge, because the proceedings concerning them are shown by a bill of exceptions? It means search of the judgment record, not of the bill of exceptions; the search and test of the sufficiency of that which was filed constituting the cause of action or ground of defense, that which invoked action, and invested the court with power to hear, try, and determine—that something which is the foundation of every judgment, and upon which it must rest, and is dependent. If the foundation here depends upon the commissioners' report, or the notice served for further hearing after the report was made, things not even part of the judgment record, and which can only be made to appear and do appear by a bill of exceptions, then, were there no bill, would there be no foundation. And if that fails, all must fall. Hence the

basic rule so often heard, and so universally applied, that allegations or jurisdictional facts to support the judgment must be in the right document and the right record, and that what ought to be of record must be proved by record, and by the right record, here the judgment record. Following this rule conserves immutable principles of jurisprudence; departing from it results in wrecks of them, and leads to absurdities. If the matters and things referred to and appearing in the bill of exceptions, and which can only be shown and made to appear by a bill, may be looked to as the jurisdictional elements or allegations to support the judgment, then may the sufficiency of a complaint be tested and its insufficiency cured by proceedings had under or in pursuance of it as shown by a bill of exceptions, and which could not be made to appear and be shown other than by a bill.

Still, let us look at this report. It is somewhat elaborate, consisting of fifteen printed pages. Much of it is historical, argumentative, and narrative, made up of generalized statements, and, as stated in the report, relating "to the effective measurement, diversion, and apportionment of the waters of Jordan River among the users thereof," but respecting which nothing is described, or specified, or characterized. "A principal dam in the river at the head of the system" is recommended. The only description of it is this: "The dimensions of this dam should be such as will meet the requirements of the contract hereinbefore referred to," a contract which the commissioners advised the court was entered into thirty years ago, "and since confirmed by decree of the Supreme Court of this state." Seven other dams are recommended at designated places along the river. The only description of them is "this dam" or "this structure should be designed so that, except in cases of floods, it will automatically divert the quantity of water to which these canals are jointly entitled, and permit the remainder to pass down the river." Referring to the measuring devices, the commissioners recommend that in each individual canal or ditch there be placed "a substantial structure in the canal or ditch as near the head thereof as is practicable for the purpose of

supporting gates that can be easily operated to regulate or entirely shut out the flow of water as may be desired, and be supplied with an effective device for securely locking the gates in any required position," and that all the structures and devices to be employed "should be durable, of reasonable cost, and most effective, and economical in operation." Any one ought readily perceive just what is meant by these graphic and perspicacious descriptions! The court is also advised of the quantity of water to which each party is entitled, the waters available for use, the kind and condition of the measuring and diverting devices then in use by the parties, the purposes and objects of the pumping plant, certain rights of the parties as fixed by "a perpetual contract" entered into thirty years ago, and of many other similar matters. Of course, the only way the court could ascertain and determine these was by having them chained and triangled by civil engineers. Arguments are made, reasons given, and opinions expressed by the commissioners why, in their judgment, the irrigating system should be regarded as "a single and complete system," as "one unit," and so, for fear the court may not view the matter in that light, and may think the conclusion at variance with the original decree, it is reminded of the impelling reasons which induced the appointment of a commissioner under that decree, and is assured that "our confidence in this view is strengthened by the action of the court in appointing a special commissioner to control and apportion the common water supply for the common benefit of the entire group."

Say they further in their report:

"Considered as a single system, its ultimate needs, as it appears to us, may be summarized as follows: (1) An ample and dependable common water supply. (2) Means for accurately measuring the common water supply. (3) Means for equalizing and regulating the common flow. (4) Means for effective apportionment and diversion. (5) Means for measuring each individual ditch supply. (6) Means for regulating each individual ditch flow. (7) Means for preventing damages from floods."

Then, further:

"To accomplish these results the equipment should be carefully planned so that the various individual ditch devices will not only effectually perform their special functions, but at the same time constitute essential units of the whole, which should be as nearly as possible automatic in its operations throughout."

And that this thus far lucid exposition may be further clarified, the court is further advised, in language equally precise and definite, as to the structures and devices to be installed that:

"As to the particular materials or peculiar form of structures to be employed in the several proposed units, we do not understand that any report is required of us relative to these and other minor details, and therefore deem it sufficient to add in this connection that, in our opinion, all of the proposed structures should, in the interests of both equity and ultimate economy, be made of good and durable material, assembled in such manner and form as to afford structures that will be both serviceable and symmetrical. We have, however, incidentally examined the detailed plans submitted by Commissioner Smith for the principal dam at the head of the system, and regard it as well suited to the place and purpose."

That is, the structures and devices should be such as are "in the interests of both equity and ultimate economy," and as "will be both serviceable and symmetrical." Though it may be difficult for some to comprehend the exact character of such a vividly described structure, and though it may seem that what heretofore was left uncertain and ambiguous by the prior descriptions is rendered unintelligible by this, yet it must be remembered it is an engineer's description based on both mechanical philosophy and equitable principles considered from the standpoint of "ultimate economy."

The court is still further advised by the report, and put in possession of the technical knowledge acquired and possessed only by civil engineers through scientific research and investigations peculiar to their profession, that frequent

storms occur on the lake, and of the effect of wind upon its waters; that Jordan River is a natural stream forty miles long, originating in Utah Lake, and terminating in Great Salt Lake. As the report here ends on that subject, I assume the river was not further traceable. And, finally, in order that the court may be relieved from any further responsibility in the premises with respect to the apportionment of costs for the improvements and structures to be placed in the river, they say:

"In conclusion we desire to say that the more we have considered the matter the more we have become convinced that all matters of expense pertaining to the supply, measurement, regulation, apportionment, etc., of the water for this entire group of canals and ditches should hereafter be apportioned according to the same schedule as that for the apportionment of the common water supply."

That is, as elsewhere stated in the report, the total cost of all the improvements "should be apportioned among the several canals and ditches of the system in the same proportion that the total common water supply is now apportioned among them, and which, in parts of the whole, is as follows," stating them—a conclusion in the very teeth of the original decree, but which, nevertheless, was followed by the court and the apportionment of costs so decreed. Nothing with respect to "estimates or computations" is contained in the report, the very things which to aid the court were required to be reported. Instead of advising the court as to the kind and character of structures and improvements that would be suitable and practical, and the probable or estimated costs thereof, the engineers merely reported that the structures and devices "should be durable, of reasonable cost, most effective, economical in operation, serviceable, and symmetrical, made of good and durable material, and should be in the interests of both equity and ultimate economy," language which, so far as aiding the court, is utterly useless and so general and indefinite as to mean nothing, and then advised the court that the system of irrigation and the waters thereof, which by the original decree had been adjudged in severalty,

should now be considered as "one unit," a "single system," the rights of the parties treated as a common and joint interest, and the costs apportioned in proportion to the interest of each. In other words, the court asked the engineers to report to him "estimates and computations" of proper and suitable structures, and they, instead of making such a report, by brief and argument, advised the court what decree should be made and how the costs of the improvements should be apportioned. This certainly is a most remarkable and presumptuous report. But such a report, such a document, or such proceedings, however liberally or broadly considered, has no semblance whatever of anything presenting issues or of constituting a jurisdictional record to support a judgment. True, after it was received in evidence, the commissioners, or some of them, were called and further examined, and gave considerable testimony with respect to what improvements, in their opinion, were needed, including the character and number of dams, weirs, measuring and diverting devices, and other structures, and the estimated cost of each. And so, as shown by the bill of exceptions, were there also put in evidence plans and specifications made by Commissioner Smith with respect to the dam at the head of the system, and testimony given by him with respect thereto. Of course we have much evidence before us, something like 1000 pages— evidence to support most anything pertaining to the irrigating system. Yet all that is answered by the familiar maxim that *pro bata* will not supply *allegata,* and that it is vain to prove what is not alleged.

I think the judgment should be annulled and vacatel.