*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2016 UT 45**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

LITTLE COTTONWOOD TANNER DITCH COMPANY;
RICHARDS IRRIGATION COMPANY; WALKER DITCH COMPANY, INC.,
*Appellants*,

*v.*

SANDY CITY; SANDY IRRIGATION COMPANY;
COHOON & MAXFIELD IRRIGATION COMPANY,
*Appellees.*

No. 20150305
Filed October 21, 2016

On Direct Appeal

Third District, Salt Lake Dep't
The Honorable Richard D. McKelvie
No. 020948020

Attorneys:

J. Craig Smith, Phillip E. Lowry, Jeffry R. Gittins,
Debra K. Caldwell, Aaron M. Worthen,
Salt Lake City, for appellants

John H. Mabey Jr., David C. Wright,
Salt Lake City, for appellees

JUSTICE DURHAM authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE,
and Court of Appeals JUDGE CHRISTIANSEN joined.

Having been recused, ASSOCIATE CHIEF JUSTICE LEE
does not participate herein; Court of Appeals
JUDGE MICHELE CHRISTIANSEN sat.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1    In 1910, the district court issued the Little Cottonwood
Morse Decree, which established water rights for the Little

Cottonwood Creek. The decree also terminated a contract that conferred a right to use a portion of this water. The Morse Decree replaced the terminated contract with new terms that govern this contractual right to use the water. The decree provides that the water may be diverted and used so long as monthly payments of seventy-five dollars are remitted to the owners of the water rights.

¶2 In 2013, several parties bound by the contractual provisions contained in the Morse Decree filed a postjudgment motion in the century-old case that resulted in the decree. The motion asked the district court to modify the decree to increase the amount of the monthly payment to account for inflation and the increased value of the water. The district court denied the motion, ruling that it did not have the authority to reopen the one-hundred-year-old case to modify the final judgment.

¶3 We affirm. The district court's authority to reopen and modify a final judgment by way of a postjudgment motion is closely circumscribed. The movants in this case have not properly invoked this narrow authority. If the movants wish to pursue their contract reformation claim, they must file a complaint.

## BACKGROUND

¶4 The facts relevant to this case date back to the mid-1800s, when Cahoon & Maxfield Irrigation Company, Richards Irrigation Company, Tanner Ditch Company, Union & East Jordan Irrigation Company, and Walker Ditch Company acquired water rights to Little Cottonwood Creek through appropriation and beneficial use. All of the primary water of the creek was appropriated by 1856.

¶5 In 1878, several railroad companies entered into a written agreement with the five canal companies to acquire water from the Little Cottonwood Creek. The contract gave the railroad companies a right to use one-tenth of the water flowing in the creek in exchange for a monthly payment of twenty-five dollars to the canal companies. The railroad companies' rights under the contract were assigned to successors in interest until the Salt Lake County Water Company (SLCWC) acquired the contractual right to one-tenth of the water flowing in the creek in 1903.[1]

¶6 In 1902, Union & East Jordan Irrigation initiated litigation to establish its water rights. The case was assigned to Judge C. W. Morse. Over the next eight years, the litigation expanded until it

---

[1] It appears that when SLCWC acquired a contractual right to the water, it was called the Sandy Pipeline Company. It changed its name in 1905.

encompassed all parties with a claim to water from the Little Cottonwood Creek.

¶7    During this litigation, the five canal companies sought to eliminate or limit SLCWC's rights under the 1878 contract. First, they argued that contract was not assignable and therefore SLCWC could not assert any rights under the contract. Second, the companies argued that the contract gave SLCWC the right to only divert one-tenth of the creek's more anemic winter flow rather than one-tenth of the much greater spring and early summer flow.

¶8    In 1908 the district court issued a decision rejecting these arguments. The court ruled that the 1878 contract was assignable and that SLCWC had acquired rights under the contract. The court also ruled that although the language of the contract probably permitted SLCWC to divert only one-tenth of the amount of the winter flow, the court would construe the contract in accord with the parties' long practice of consistently permitting the diversion of one-tenth of the flow during "the period of primary water."

¶9    In 1910, the district court issued a comprehensive final judgment that determined all rights to the water from the Little Cottonwood Creek. This final judgment has come to be known as the Little Cottonwood Morse Decree. The district court found that the primary flow of the creek was 94.79 second feet. It divided 2.29 second feet among seven smaller ditches. The court split the remaining 92.5 second feet of primary water among the five larger canal companies bound by the 1878 contract. Thus the decree allocated all of the primary water rights that had been acquired through appropriation and use by 1856.

¶10 The Morse Decree also recognized SLCWC's contractual right to use a portion of the five canal companies' water rights. The decree terminated the 1878 contract and stated that this prior agreement would be superseded by the new terms laid out in the decree. The decree provides that:

> The Salt Lake County Water Company, by agreement and consent, is to have perpetually and continually, except as hereinafter stated, turned into the Sandy Ditch one tenth of all the primary water [owned by the five canal companies]. . . . Said Water Company is to pay to the Treasurers of the Tanner, Richards, Cahoon & Maxfield, Union & Jordan and Walker ditches seventy-five dollars per month . . . . If said Water Company shall be in default hereunder for twenty days after written notice to make payment, then

> it shall, at the option of any of said last five named ditches, at once forfeit to said [five canal companies] all its rights and properties hereby given to it. Said Water Company agrees to pay reasonable attorneys' fees to [the five canal companies] for successfully enforcing in court their rights herein as to said payments and forfeiture.

The court did not state why it reformed the 1878 contract or why it increased the monthly payment to seventy-five dollars, and the record before us sheds little light on this question.

¶11 Soon after the Morse Decree was entered, SLCWC transferred a portion of its rights under the decree to the Sandy Irrigation Company. Sandy City later acquired the other portion of SLCWC's Morse Decree rights. The city also holds a majority stake in the Sandy Irrigation Company. It appears that the Sandy Irrigation Company and Sandy City (collectively, Sandy) made monthly payments to the five canal companies for over a century in exchange for water from the Little Cottonwood Creek.

¶12 During the one hundred years that have passed since the Morse Decree, three of the canal companies, Richards Irrigation Company, Tanner Ditch Company, and Walker Ditch Company (hereinafter, the canal companies), became dissatisfied with the amount of their share of the monthly payments. In 2013, the three canal companies sought court intervention to increase the amount of the payment. But the canal companies did not file a complaint to invoke the district court's original jurisdiction. Instead, the canal companies filed a postjudgment motion in the century-old litigation that resulted in the Morse Decree. The motion asked the district court to modify the 1910 final judgment to dramatically increase the amount of the monthly payments to account for inflation and the increased value of the water. Sandy opposed the motion.

¶13 The district court denied the canal companies' motion to modify the Morse Decree. It concluded that rule 60(b) of the Utah Rules of Civil Procedure did not permit it to reopen the decree. The court also rejected the canal companies' argument that it had the inherent, common-law authority to modify the Morse Decree by way of a postjudgment motion.

¶14 The canal companies appealed from the district court's order denying their motion.

**ANALYSIS**

¶15 On appeal, the canal companies disclaim any reliance upon rule 60(b) to reopen and modify the 1910 Morse Decree. Nor do they

rely upon any other rule of civil procedure. Instead, they argue that the district court erred when it concluded that it did not have the authority to grant the postjudgment motion for two reasons. First, they argue that district courts have the common-law authority to modify a water decree at any time. Second, they argue that the Morse Decree itself provides for continuing jurisdiction to modify the decree.

¶16 The district court's determination that it did not have the authority to grant the canal companies' postjudgment motion is a legal determination that we review *de novo*. *See W. Water, LLC v. Olds*, 2008 UT 18, ¶ 15, 184 P.3d 578 ("Jurisdictional questions are . . . legal issues that we review for correctness, affording no deference to the district court."); *see also Swallow v. Jessop* (*In re United Effort Plan Trust*), 2013 UT 5, ¶ 18, 296 P.3d 742 ("[A]bstract legal questions" are reviewed *de novo*. (citation omitted)).

## I. THE DISTRICT COURT DID NOT HAVE COMMON-LAW AUTHORITY TO MODIFY THE MORSE DECREE THROUGH A POSTJUDGMENT MOTION

¶17 Before a final judgment is entered, district courts have broad discretion to reconsider and modify interlocutory rulings. *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588. But after a judgment is entered, the district court's power to modify the judgment is limited. *See Richards v. Siddoway*, 471 P.2d 143, 145 (Utah 1970) ("After expiration of [the time limit to set aside a judgment under rule 60(b)], a judgment[] is no longer open to any amendment, revision, modification, or correction which involves the exercise of the judgment or discretion of the court on the merits or on matters of substance." (citation omitted)). Otherwise, dissatisfied litigants could file endless cycles of motions for reconsideration in an attempt to achieve a better result. The finality of judgments rule recognizes that at some point, litigation must end.

¶18 The Utah Rules of Civil Procedure provide a few narrow exceptions to the finality of judgments. Under rule 50(b), a party may move for a judgment notwithstanding a verdict after entry of judgment. Rule 59 permits motions for a new trial or to amend the judgment. And rule 60(a) permits corrections of clerical mistakes found in judgments, while rule 60(b) allows a court to set aside a judgment under certain circumstances.

¶19 There is also at least one common-law exception. District courts retain the power to modify even a final injunctive decree:

> There is also no dispute but that a sound judicial
> discretion may call for the modification of the terms of

> an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief.

*Sys. Fed'n No. 91, Ry. Emps.' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961); *accord Lapin v. Shulton, Inc.*, 333 F.2d 169, 170 (9th Cir. 1964) ("It is clear that the issuing court has continuing jurisdiction to modify or revoke an injunction as changed circumstances may dictate."); *see also Thompson v. Liquor Control Comm'n*, 52 P.2d 463, 464 (Utah 1935) ("[T]he district court is vested with jurisdiction" to "quash or modify [an] injunction.").

¶20 The canal companies argue that another common-law exception applies in this case. They contend that water decrees are different than other final judgments and that district courts retain the inherent authority to modify water decrees at any time. They rely upon two cases for this proposition: *Orderville Irrigation Co. v. Glendale Irrigation Co.*, 409 P.2d 616 (Utah 1965) and *Salt Lake City v. Salt Lake City Water & Elec. Power Co.*, 174 P. 1134 (Utah 1918). We examine each of these authorities in turn.

### A. Orderville

¶21 In *Orderville*, Orderville Irrigation and Glendale Irrigation disputed the nature of their respective water rights under a decree issued by the district court. Orderville contended that the water decree required the two companies to simultaneously take water from the Virgin River on a "share-and-share alike basis." *Orderville*, 409 P.2d at 618. Glendale, on the other hand, asserted that the water decree recognized the superiority of its water right and that it was entitled to take the full measure of its water before Orderville could draw any remaining water. *Id.* Orderville brought an action to enforce its interpretation of the water decree. *Id.*

¶22 Glendale argued that Orderville's action was barred by the principle of *res judicata* because the court that issued the water decree had already resolved the issue of priority. *Id.* This court disagreed, stating:

> In regard to the plea of res judicata and too long delay in filing this action, it is not to be doubted that whatever issues were litigated and adjudicated by the Cox Decree are now concluded and cannot be raised.

But it is important to keep in mind that we are not here concerned with the usual type of judgment. An adjudication as to the allocation of flowing water, the amount of which necessarily fluctuates from time to time, is a decree in equity as to the rights in their continuing use. It is inherent in the nature of such a decree that the court has continuing jurisdiction, when properly invoked, to see that its provisions are being complied with. Where disputes arise as to the manner or amount of use; or where there are uncertainties in the decree which give rise to a genuine dispute as to the rights of the parties concerning the use of such waters, neither the rule of res judicata nor the statute of limitations prevents resort to the courts to settle such a controversy.

*Id.* at 619 (footnote omitted).

¶23 The canal companies in this case argue that *Orderville* gives district courts the authority to grant postjudgment motions to modify the terms of a water decree. They support this contention by pointing to statements in *Orderville* that water decrees are not "the usual type of judgment" and that "[i]t is inherent in the nature of such a decree that the court has continuing jurisdiction, when properly invoked, to see that its provisions are being complied with." *Id.*

¶24 But this language only confirms the principle that district courts retain the jurisdiction to enforce a final judgment. If a party fails to comply with a specific directive of a judgment, another party to the judgment may move to enforce this directive. *Berman v. Yarbrough*, 2011 UT 79, ¶¶ 14–15, 267 P.3d 905. But "[a] court's power to enforce a judgment is confined to the four corners of the judgment itself." *PacifiCorp v. Cardon*, 2016 UT App 20, ¶ 6, 366 P.3d 1226 (memorandum decision) (alteration in original) (citation omitted). "[A] motion to enforce 'cannot be used to take up matters beyond the contours of the judgment and thereby short-circuit the usual adjudicative processes.'" *Berman*, 2011 UT 79, ¶ 15 (citation omitted). Because the canal companies' postjudgment motion does not seek to enforce "a clear directive for a party to undertake a certain action," *id.*, but rather to change the Morse Decree, the district court's authority to enforce a judgment has no application here, *see PacifiCorp*, 2016 UT App 20, ¶ 6 ("[G]ranting a motion to enforce a judgment is procedurally proper only if the 'unequivocal mandate' which the court is enforcing is also contained in the judgment." (citation omitted)).

7

¶25 Moreover, *Orderville*'s core holding—that a separate action to clarify "uncertainties in [a water] decree which give rise to a genuine dispute as to the rights of the parties concerning the use of such waters" is not barred by the doctrine of *res judicata*—does not help the canal companies. 409 P.2d at 619. First, the canal companies do not seek to clarify an ambiguity in the Morse Decree, but rather to change a clear provision of the decree. Second, there is a key difference between the procedural posture of *Orderville* and this case. *Orderville* held that a separate action to interpret uncertain terms of a water decree was not barred as *res judicata*. But the canal companies here did not file a separate action; they filed a postjudgment motion in the same case.[2] Thus, *Orderville* does not support the proposition that district courts have the authority to modify a water decree through a postjudgment motion.

## B.  Salt Lake City Water

¶26 *Salt Lake City Water* likewise does not advance the canal companies' argument. The 1901 water decree at issue in that case adjudicated water rights to Utah Lake and the Jordan River. *Salt Lake City Water*, 174 P. at 1134; *Salt Lake City v. Utah & Salt Lake Canal Co.*, 137 P. 638, 639 (Utah 1913). The decree also contained provisions that governed the future operation of pumps that moved water from Utah Lake into the Jordan River during periods when the natural "gravity flow" of the river was insufficient to meet the needs of water users. *Salt Lake City Water*, 174 P. at 1134-35. The decree laid out a detailed formula for determining how water users would split the cost of operating the pumps based on when individual water users agreed to commence pumping, or failing an agreement, when one of the water users requested that pumping begin. *Id.*

¶27 A dispute later arose over which water users were required to pay for the operation of the pumps. *Id.* at 1135. A proceeding was commenced in the original action to enforce the terms of the decree. *Id.* at 1134. The district court determined that the decree required one of the water users, the South Jordan Canal Company, to contribute $1,015.65 toward the cost of operating the pumps in the 1914 calendar year. *Id.* at 1135. South Jordan appealed, contending that the language of the water decree regarding the future operation of the pumps should be interpreted in a way that excused it from paying for the operation of the pumps. *Id.* at 1135-36. This court disagreed and held that the district court correctly applied the plain

---

[2] "Res judicata is more appropriately used to describe the binding effect of a decision in a prior case on a second case . . . ." *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 26 n.20, 196 P.3d 588. It does not apply to a motion filed in the same case. *See id.*

language of the water decree when it enforced that judgment. *Id.* at 1136–37.

¶28 In dicta, this court also stated that the district court had the power to amend the portion of the water decree concerning the operation of the pumps:

> By what we have said we do not wish to be understood as holding that the decree as it now stands is or is not, under all circumstances, fair, equitable, and just in so far as the apportionment of the costs and expenses of operating the pumps are concerned. If, however, conditions requiring it have arisen that can be established by proper evidence, the lower court has ample power to modify the decree so as to reflect equity and justice under all circumstances to all the water users.

*Id.* at 1137.

¶29 The canal companies in this appeal argue that this dictum supports its contention that the district court has the continuing authority to modify the Morse Decree. They contend that *Salt Lake City Water* stands for the broad proposition that a postjudgment motion is an appropriate vehicle to invoke a district court's power to modify a water decree "so as to reflect equity and justice." *Id.*

¶30 The dictum from *Salt Lake City Water*, however, is not so far-reaching. The opinion limits its statements regarding the district court's continuing jurisdiction to modify the water decree to the portion of the decree governing "the apportionment of the costs and expenses of operating the pumps." *Id.* In other words, the dictum in *Salt Lake City Water* deals with the part of the decree that controls the ongoing operation of the physical infrastructure used to deliver water to water right holders.

¶31 Similar to other early twentieth-century water decrees, the 1901 Jordan River water decree had two distinct parts. First, the water decree adjudicated the parties' water rights obtained through prior appropriation and use. *See id.* at 1134. Second, the decree contained provisions governing the infrastructure—such as headgates, diversions, dams, and pumps—and personnel needed to measure and allocate the water in accord with these water rights. *See id.* at 1134–35; *see also Salt Lake City v. Salt Lake City Water & Elec. Power Co.*, 67 P. 672, 674 (Utah 1902). *Salt Lake City Water*'s pronouncement regarding continuing jurisdiction refers to this second part of the Jordan River decree that dealt the administration of the infrastructure necessary to deliver the water.

¶32 A contemporaneous opinion of this court recognized this distinction between the adjudication of water rights and the administration of infrastructure to implement these rights. In *Salt Lake City v. Utah & Salt Lake Canal Co.*, one of the parties to the 1901 Jordan River water decree, the Utah & Salt Lake Canal Company, filed a motion requesting improvements to the infrastructure necessary to deliver water from the Jordan River. 137 P. at 639–40. At an evidentiary hearing, the district court heard evidence from water engineers that repairs and improvements to dams, weirs, and measuring devices were needed in order to fairly distribute water in accord with the rights adjudicated in the 1901 decree. *Id.* at 640, 643–44. The court agreed with the water engineers and ordered that the improvements be carried out and that the costs be shared by the water right owners. *Id.* at 641.

¶33 On appeal, one of the water users argued that the district court lacked the authority to issue the order because the Utah & Salt Lake Canal Company did not file a separate pleading to invoke the district court's jurisdiction. *Id.* at 641–42. This court held that the district court did have the authority to grant the motion filed by the canal company because the district court has "the power to make such orders as may be necessary to carry out and give effect to their decrees." *Id.* at 642. In so holding, we distinguished the adjudication of water rights, which cannot be modified by motion, from ancillary orders necessary to give effect to those rights:

> [T]he [district] court retained, and still retains, jurisdiction "for the purpose of [making] all necessary supplemental orders and decrees which may be required to make effectual the rights awarded and preserved by the decree." In this proceeding the action of the court was invoked, not for the purpose of adjudicating property rights and conflicting interests of the parties pertaining to the subject-matter of the action, but to carry into effect the provisions of the decree. The pleadings forming the issues and the judgment rendered thereon, in which the property rights of the respective parties to the action are adjudicated, were, and will continue to be, sufficient to authorize any of the parties to the decree to invoke the jurisdiction and action of the court when necessary to carry out and make effectual the provisions of the decree.

*Id.* (third alteration in original).

¶34 Thus, *Salt Lake City Water* and *Utah & Salt Lake Canal Co.* stand for the proposition that district courts retained jurisdiction to modify language in a water decree regarding the continued operation of a water system's infrastructure and to order that improvements to this infrastructure be made. To the extent that early twentieth-century district courts assumed an administrative role over the continued operation of a water system in a decree, the court retained the authority to modify or update these portions of the water decree. Continuing jurisdiction was necessary because, like an injunctive decree, the ongoing administration of a water system may require adjustments to account for changing conditions. *See Sys. Fed'n No. 91*, 364 U.S. at 647; *supra* ¶ 19. But a court does not retain ongoing jurisdiction to modify the portion of a water decree that adjudicates the parties' water rights.

¶35 In this case, the canal companies argue that the district court has continuing jurisdiction to modify the portion of the Morse Decree that established Sandy's contractual right to use water from the Little Cottonwood Creek in exchange for monthly payments. But this portion of the decree is an adjudication of a contractual right to use the water; it is not a directive concerning the future operation of a water delivery system's infrastructure as was the case in *Salt Lake City Water*. We therefore conclude that the dictum from *Salt Lake City Water* does not support the canal companies' contention that the district court retained the authority to grant a postjudgment motion to modify this portion of the Morse Decree.[3]

---

[3] This distinction between an adjudication of rights and injunction-like administrative pronouncements in early water decrees also explains orders made by the district court after the Morse Decree was handed down. The decree states that "Peter Van Valkenburg is hereby appointed Commissioner, until further order of this court, to carry the decree herein into effect. The Commissioner's expenses and compensation shall be paid . . . by the owners of such primary water and in proportion that each ditch is entitled to such water." The Morse Decree further provides that "subject to the supervision and control" of the district court, "[t]he commissioner provided for herein may divide and distribute the water by hours or days or by constant streams, or in any other manner, as in his judgment seems best, so as to secure the greatest efficiency of the water."

The district court has entered two orders in the case over the last century to exercise this continuing supervisory control over the court-appointed water commissioner. In 1952, Peter Van Valkenburg

¶36 There may be other procedural paths that the canal companies can take to invoke the district court's jurisdiction (e.g. proceedings under rule 60(b) or an independent action for contract reformation). However, no arguments concerning that possibility have been made in this case, and we decline to reach the question of the availability of other procedural options.

## II. THE MORSE DECREE DOES NOT AUTHORIZE THE CANAL COMPANIES' POSTJUDGMENT MOTION

¶37 The canal companies also argue that the Morse Decree itself provides for continuing jurisdiction in the district court to modify nearly all of the terms of the decree. They point to paragraph 39 of the decree, which describes the powers of the water commissioner appointed by the court to apportion the water of the Little Cottonwood Creek in accordance with the water user's rights under the decree:

> The commissioner provided for herein may divide and distribute the water by hours or days or by constant streams, or in any other manner, as in his judgment seems best, so as to secure the greatest efficiency of the water. *All of the above, however, is subject to the supervision and control of this court.*

(emphasis added). The canal companies assert that the phrase "[a]ll of the above" refers to all of the terms of the water decree preceding that sentence, including the reformation of SLCWC's contractual right to use a portion of the water found in paragraphs 33 and 34 of the decree. Thus they contend that the court specifically retained "supervision and control" over the terms of the modified contract.

¶38 We disagree. Setting aside the question of whether a district court may seize for itself procedural authority that it otherwise would not have, this language does not refer to the entire preceding twenty pages of the decree. Taken in context, the phrase "[a]ll of the

---

died, and several of the parties to the Morse Decree requested that he be replaced by Orin Van Valkenburg. The district court granted the request, and later that year it issued an order increasing the commissioner's annual salary from $616 to $1,000.

The canal companies argue that these postjudgment orders illustrate the district court's continuing jurisdiction to alter the Morse Decree. But these orders merely demonstrate the court's continuing administrative supervision over the court-appointed water commissioner. The orders do not support the canal companies' contention that the district court retains the authority to modify an adjudication of rights through a postjudgment motion.

above" references the previous sentence in which the court gives the appointed commissioner the authority to distribute the water. The conjunctive adverb "however" indicates that the second sentence of paragraph 39 is a qualification to the first sentence of the paragraph. We therefore conclude that the Morse Decree does not provide for continuing jurisdiction to modify the contractual terms contained in the decree.

## CONCLUSION

¶39 In this appeal, we resolve the narrow question of whether the canal companies can modify the Morse Decree through a postjudgment motion. We hold that such a motion is an inappropriate procedural vehicle to pursue this objective. We therefore affirm the district court's order denying the motion.

––––––––––––