**2019 UT App 197**

## THE UTAH COURT OF APPEALS

ROSS AND NORMA ALLEN FAMILY TRUST, ROSS ALLEN, NORMA
ALLEN, AND DAVID ALLEN,
Appellees and Cross-appellants,

*v.*

JEFFREY HOLT, DAVID CHRISTENSEN, MILLENNIAL PARTNERS NORTH
LLC, JENNA ALLEN HOLT, JARL R. ALLEN, AND LESLY ALLEN BECK,
Appellants and Cross-appellees,

SCOTT WILLIAMS AND CHRISTINE WILLIAMS,
Intervenors and Appellees.

Opinion
No. 20180614-CA
Filed December 5, 2019

Second District Court, Ogden Department
The Honorable Mark R. DeCaria
No. 130905963

David C. Wright, Jonathan R. Schutz, and
Philip C. Patterson Attorneys for Appellants
and Cross-appellees

Edwin C. Barnes and Timothy R. Pack, Attorneys for
Appellees and Cross-appellants

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES KATE APPLEBY and DAVID N. MORTENSEN concurred.

HAGEN, Judge:

¶1　The appellants (collectively, the Millennial parties) appeal a number of issues stemming from the district court's finding that the appellees (collectively, the Allens) have an established water conveyance easement under the 1866 Mining Act. We conclude that sufficient evidence supported the district court's finding that the Allens' predecessors possessed an easement to

convey water from a source known as Dan's Camp through ditches constructed before 1896. Based on this finding, we affirm the district court's legal conclusion that the Allens have a right of way pursuant to the 1866 Mining Act.

¶2 The Allens have also filed a cross-appeal, arguing that the district court abused its discretion when it found that the Millennial parties had not forfeited their water right by clear and convincing evidence. Because the Allens established by clear and convincing evidence that the Millennial parties were not putting the water at issue to beneficial use, the district court exceeded its discretion by concluding that the Millennial parties' water right was not forfeited. Therefore, we reverse and remand to the district court to enter a judgment that the Millennial parties forfeited their water right.

BACKGROUND[1]

¶3 This appeal concerns the right to use and convey water from collection points across land owned by the Millennial parties to a place where it can be put to beneficial use by the Allens. The collection and use of the water in question dates from the 1880s when Ammon Allen settled in Ogden Valley. By at least 1895, Ammon[2] had constructed apparatuses to divert

---

1. Both the Millennial parties and the Allens, respectively, appeal and cross-appeal from a bench trial. Accordingly, we recite the facts in the light most favorable to the findings of the district court, presenting conflicting evidence only as necessary to understand issues raised on appeal. *State v. Cowlishaw*, 2017 UT App 181, ¶ 2, 405 P.3d 885.

2. As is our practice in cases where we reference multiple individuals who share a last name, we refer to them by their first name with no disrespect intended by the apparent informality.

water from multiple points, colloquially known as the Garner Springs (which consisted of the Upper and Lower springs) and Dan's Camp, to a parcel identified as Section 34. In 1923, Ammon deeded the Section 34 property to his son, Abner Allen.

¶4 The right to convey water from these diversion points was formally established by a decree from a Utah district court in 1948 (Ogden River Decree). The Ogden River Decree designated that Abner owned a right to convey water from "Sheepherd Creek," also known as Dan's Camp,[3] and "Garner Springs" through an "unnamed ditch" for the purpose of irrigating land in Section 34. The conveyance of water from the diversion points to land in Section 34 ran through abutting land then owned by the Utah School and Institutional Trust Lands Administration (SITLA).

¶5 In 1963, Abner's sons, Ross, Scott, Garth, and Lawrence, formed the Allen Ranch Company (ARC), and Abner deeded the Section 34 property and its corresponding water right to ARC. In 1972, each of Abner's sons collectively entered into a twenty-five-year lease with SITLA to use the abutting property (the servient estate) for farming purposes. The lease contained language providing that fixtures left on the servient estate more than a year after the lease's termination would become SITLA property, but it also contained a provision that the lease was "subject to any and all valid and existing rights in [the servient estate]."

¶6 The four sons dissolved ARC in 1977. The dissolution agreement granted 60% of the water right to Ross, 30% to Scott, and 10% to Garth. The only known document supporting the

---

3. Although the Ogden River Decree refers to "Sheepherd Creek," there is record evidence that Dan's Camp is a family name for a tributary of Sheepherd Creek. We will refer to this diversion point as Dan's Camp from this point forward.

existence of this arrangement is a deed issued by ARC to Scott conveying real estate and 30% of the water right. However, after ARC dissolved, Abner issued two conflicting deeds to Ross. The first deed granted Ross the Section 34 property along with the entirety of the water right. Subsequently, Abner issued a second deed granting Ross only 70% of the water right. In 1983, the Ogden River Decree water right was renumbered to reflect that Ross had 70% of the water right, while Scott had 30%.

¶7    Despite the apparent confusion surrounding deed ownership and title, all parties involved acted as though issues related to land and water were well-settled for decades after 1983, and the district court found that Abner's deed granting Ross the 70% water right best reflected the expectations of the parties based on their behavior.

¶8    In 1979, Ross and his son, David, paid for and constructed a system of pipes to convey water from the diversion points to the Section 34 property. The pipe system generally followed the open ditch once used to convey water across the servient estate and was intended to improve the flow of water by eliminating evaporation and ground absorption during conveyance.

¶9    Near the time of his death in 1994, Scott deeded his 30% interest to his children, Jarl, Jenna, and Lesly.

¶10    In 1998, the State sold the servient estate to a company called Still Standing Stables (SSS). In anticipation of the sale to SSS, interested parties, including Ross, were put on notice that any unclaimed fixtures on SITLA ground, if not claimed and removed, would escheat to the land and be lost to the owners. Ross and his family did not make a claim for the piping system across the servient estate, and the district court initially ruled on a motion for summary judgment that the piping system was abandoned to SSS as a result. But the district court later reversed its own ruling, instead holding that Ross and his descendants did not forfeit the system and still had ownership over it. In any

event, Ross conveyed his 70% interest in the water right to David in 2007.

¶11     In 2008, SSS sold its land to Millennial Partners North LLC (MPN). After MPN gained ownership of the servient estate, the disputes between the parties began as MPN became concerned about David and his family "gaining access to the property in an unregulated way to maintain the easement." In the ensuing conflict, MPN sent letters to David to try to assert control over access to the property, erected fences around the property, and eventually dug up and cut the pipes with a chainsaw to interrupt the conveyance of water to the Section 34 property. As a result of these disputes, the parties litigated a previous lawsuit in 2009. In that case, the district court entered a stipulated judgment with findings that David possessed a water right at Dan's Camp and owned the conveyance system that was on the servient estate.

¶12     In 2011, Jarl, Jenna, and Lesly conveyed their land and 30% interest to MPN. Thus, collectively, the Millennial parties (which include Scott's children, Jarl, Jenna, and Lesly) have owned the 30% interest originally belonging to Scott since 1994, when Scott deeded the interest to his children. However, there is no evidence that any of the Millennial parties have ever personally put the water right to beneficial use.

¶13     Finally, in 2012, the Allens instigated the present lawsuit. They sought a declaratory judgment affirming that they own an easement to convey water through the servient estate to the Section 34 property as well as the pipe system. They also alleged that the Millennial parties unlawfully interfered with their water right and that the Millennial parties had forfeited their water right as the result of nonuse. Following a bench trial, the district court agreed with the Allens that they owned a water right easement and that the Millennial parties had interfered with that water right. However, the district court found that nonuse of the MPN water right had not been proven by clear and convincing

evidence, and thus rejected that claim. The Millennial parties now appeal the district court's rulings against them, and the Allens cross-appeal the district court's rejection of their water forfeiture claim.

ISSUES AND STANDARDS OF REVIEW

¶14 The Millennial parties raise numerous issues on appeal, including whether the district court (1) erred in finding that Dan's Camp is a diversion point for the Allens' water right, (2) erred in concluding that the Allens have a right of way pursuant to the 1866 Mining Act, (3) abused its discretion by reconsidering and reversing its own prior summary judgment ruling, (4) erred in finding that the Allens had not abandoned their easement and right to convey water from the Upper Spring diversion point, and (5) erred in finding that the Millennial parties interfered with the Allens' water right and awarding attorney fees based on that interference. Despite the apparent complexity of these issues, all of them turn on whether the district court properly found that the Allens have a current water right easement pursuant to the 1866 Mining Act that includes both Dan's Camp and the Garner Springs as diversion points.

¶15 "We review findings of fact under the clearly erroneous standard." *Abraham & Assocs. Trust v. Park*, 2012 UT App 173, ¶ 11, 282 P.3d 1027 (cleaned up). "To find clear error, we must decide that the factual findings made by the trial court are not adequately supported by the record, resolving all disputes in the evidence in a light most favorable to the trial court's determination." *Id.* (cleaned up). However, "the ultimate determination of whether an easement exists is a conclusion of law, which we review for correctness." *Judd v. Bowen*, 2018 UT 47, ¶ 8, 428 P.3d 1032 (cleaned up). Nevertheless, "such a determination is the type of highly fact-dependent question . . . which accords the [district court] a broad measure of discretion

when applying the correct legal standard to the given set of facts." *Id.* (cleaned up). Accordingly, we will "overturn the finding of an easement only if [we] find[] that the [district court's] decision exceeded the broad discretion granted." *Id.* (cleaned up).

¶16 On cross-appeal, the Allens argue that the district court erred in concluding that the Millennial parties did not forfeit their water right under Utah Code section 73-1-4 by failing to put the water to beneficial use. "Whether a water right holder has put her water to beneficial use is a mixed question of fact and law, and we grant the district court's ruling significant, though not broad, discretion." *Salt Lake City Corp. v. Haik*, 2019 UT App 4, ¶ 43, 438 P.3d 913 (cleaned up). However, because water forfeiture rulings are heavily dependent on questions of fact, "we will reverse the court's findings of fact only if they are clearly erroneous." *Id.* (cleaned up).

ANALYSIS

I. The 1866 Mining Act Easement

¶17 The United States Congress enacted the 1866 Mining Act, in part, to recognize water rights acquired by owners and possessors of those rights that were recognized by local custom, laws, and decisions of local courts. *See* 14 Stat. 251–53 (codified at 43 U.S.C. § 661 (1976)); *see also Jennison v. Kirk*, 98 U.S. 453, 460–61 (1878) (discussing the general purpose of the 1866 Mining Act). To establish a water conveyance easement under the 1866 Mining Act, a "prospective grantee must possess valid water rights under state law, and the water facilities must have been constructed on unoccupied and unreserved lands." *Roth v. United States*, 326 F. Supp. 2d 1163, 1175 (D. Mont. 2003) (citing *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1, 12 (1896)). The parties agree that the Ogden River Decree satisfies the first element by establishing that the Allens had a

valid water right under Utah law—although they disagree about whether that right pertains to Dan's Camp.[4] As to the second element, the parties also appear to agree that Dan's Camp was unoccupied and unreserved until 1896, when Utah became a state. Thus, a primary dispute in this case is whether the ditches at Dan's Camp were constructed before 1896, as the district court found. We are asked to determine whether that factual finding is clearly erroneous and whether, having made that finding, the district court properly exercised its discretion in applying the law to those facts to determine the existence of the claimed easement.

¶18    In reviewing the evidence supporting the district court's finding, we note that, because of the difficulties inherent in proving actions regarding water use that occurred more than a century ago, the law does not require prospective grantees to put on "overwhelmingly clear evidence" of a water ditch's date of construction or location. *See Eskelsen v. Town of Perry*, 819 P.2d 770, 774 (Utah 1991) (declining to adopt "[r]igid standards regarding proof" of pre-1903 beneficial water use). Utah courts will recognize a water conveyance easement so long as it is supported by the "best information available." *See id.* Here, the best information available supports the district court's factual finding that the Dan's Camp ditches were constructed before 1896. Accordingly, the district court did not exceed its "broad discretion" in concluding that the Allens have a water conveyance easement at Dan's Camp under the 1866 Mining Act. *See Judd v. Bowen*, 2018 UT 47, ¶ 8, 428 P.3d 1032 ("An appellate court should overturn the finding of an easement only if it finds

4. That the Allens had a valid 1866 Mining Act water right pertaining to the Garner Springs is clear because those springs are explicitly named as sources of the right in the Ogden River Decree. The only dispute regarding the Garner Springs is whether the Allens forfeited the right to convey water across the Upper Spring. This issue is addressed below. *See infra* ¶ 22.

that the [district court's] decision exceeded the broad discretion granted." (cleaned up)).

¶19   The district court's finding that the Dan's Camp ditches were constructed before 1896 was supported by multiple pieces of evidence. The Ogden River Decree confirms that the Allens' predecessors had a water conveyance easement for an "Unnamed Ditch" under the 1866 Mining Act by at least 1895. The Allens presented evidence suggesting that this "Unnamed Ditch" was at Dan's Camp. Specifically, Garth Allen testified that the original ditch must have existed at Dan's Camp because the ditches had to follow the natural contours of the hillsides to maintain elevation so that gravity would guide the water to the Section 34 property. In contrast, the Millennial parties were unable to offer any alternative explanation for "how the water was conveyed" before the 1920s, when they argue the ditch was actually constructed, even though the "distance between the water source and the land on which it was used made it necessary to construct facilities to convey the water."[5] Additionally, the parties previously agreed that Dan's Camp

---

5. The only evidence that the Millennial parties cite to show that the Dan's Camp ditch was built in the 1920s is a collection of journal entries from Elmina Allen, Abner Allen's wife. But these entries were written decades after the events described took place and were not based on Elmina's personal observations. This caused the district court to exclude the journal entries as hearsay absent a showing that an entry was based on personal observation. Because the Millennial parties have not appealed this evidentiary ruling, we do not consider the journal entries in our weighing of the evidence. *See Save Our Canyons v. Board of Adjustment of Salt Lake County*, 2005 UT App 285, ¶ 21, 116 P.3d 978 (declining to consider evidence attached to a denied motion to clarify the record because the appellant did not appeal from the denial of that motion).

was a source for the Allens' water conveyance easement, as stated in the stipulated order from the prior lawsuit.[6]

¶20 This evidence from the record represents the best information available regarding the timing and location of the original ditch's construction, and it supports the district court's finding that it was located at Dan's Camp. Based on this finding, the district court acted within its discretion in applying the facts to the law, specifically the 1866 Mining Act, to reach the legal conclusion that the Allens had a water conveyance easement at Dan's Camp. *See id.* ¶ 8.

¶21 Having determined that the district court did not exceed its discretion in finding that the Allens have an 1866 Mining Act water right relating to both Dan's Camp and the Garner Springs, the other issues raised by the Millennial parties are easily resolved. First, the Millennial parties argue that the district court abused its discretion by reversing its prior summary judgment ruling that the Allens forfeited ownership to the water conveyance system on the servient estate. This contention is based on a provision in the SITLA lease stating that any fixtures not retrieved from the property within a year of the lease's expiration would escheat to the property. Under this theory,

---

6. The parties dispute whether the stipulated judgment acts as res judicata and precludes the Millennial parties from disputing whether Dan's Camp is actually a source of the Allens' water right. While we acknowledge that other courts have held that stipulated judgments can preclude parties from litigating issues decided in the previous action, *e.g.*, *Jones, Waldo, Holbrook & McDonough v. Cade*, 98 F. App'x 740, 748 (10th Cir. 2004), it is not necessary for us to rely on res judicata to decide this issue. The fact that the parties stipulated to this judgment serves as an additional piece of evidence that, when combined with the other evidence described, adequately supports the district court's conclusion that the ditch was located at Dan's Camp.

after the lease expired, the water system fixtures became the property of SITLA and that ownership later transferred to SSS and then to MPN. But because the Allens' water right preceded SITLA's ownership of the property, SITLA took possession of the land subject to the existing water easements that burdened it, as acknowledged by the lease. *See Sullivan v. Northern Spy Mining Co.*, 40 P. 709, 710–11 (Utah 1895) (explaining that a subsequent owner who takes possession of land takes the land subject to any water easements burdening it). The law allows easement holders to make improvements to an easement, with such improvements or fixtures remaining the property of the easement holder. *See Stern v. Metropolitan Water Dist. of Salt Lake & Sandy*, 2012 UT 16, ¶ 69, 274 P.3d 935 ("[T]here is a firmly established background rule that an easement holder may make technological upgrades to *its property*, so long as they are not unreasonably burdensome to the servient estate." (emphasis added)); *Zions First Nat'l Bank v. Carlson*, 464 P.2d 387, 391 (Utah 1970) ( "[T]rade fixtures remain personalty and do not become a part of the realty."). So, because the Allens' water right existed before SITLA came to possess the property, ownership of the conveyance system never transferred to SITLA despite the fact that the fixtures were not removed after the lease expired. In other words, as the district court correctly observed, SITLA could not have transferred ownership of the system to SSS or any other party because "the water system was never SITLA's to give away." Accordingly, the district court did not abuse its discretion by reconsidering and correcting its prior summary judgment ruling to the contrary. *See Little Cottonwood Tanner Ditch Co. v. Sandy City*, 2016 UT 45, ¶ 17, 387 P.3d 978 ("Before a final judgment is entered, district courts have broad discretion to reconsider and modify interlocutory rulings.").[7]

---

7. Any argument that the Allens abandoned the water conveyance system due to their failure to make a claim after

(continued…)

¶22    Next, the Millennial parties argue that the district court erred in finding that the Allens did not forfeit their water right and easement across the Upper Garner Spring. As conceded by the Millennial parties, the Garner Springs are expressly named as sources of the water right in the Ogden River Decree. Nevertheless, the Millennial parties contend that the Allens abandoned this right because "they never asked for, nor acquired, a right to convey water from the Upper Spring" in the prior lawsuit. However, the Allens already owned a right to convey water across the Garner Springs—including the Upper Spring—because the Ogden River Decree expressly granted that right in accord with the 1866 Mining Act, so there was no need for the Allens to ask for or acquire such a right in the prior lawsuit.

¶23    Finally, the Millennial parties argue that the district court erred in finding that they interfered with the Allens' water right. This argument also depends entirely on the Millennial parties' assertion that no such water right existed. Having found that such a right exists, the district court was correct to find interference. Indeed, it is difficult to imagine a more clear-cut case of interference with a water right than a party threatening to shut off access to the water, fencing off the right of way, and sawing through a pipe conveying the water to its rightful recipients.

¶24    The existence of the water right and the acts of interference also compel the conclusion that the district court was correct to award attorney fees to the Allens. Utah law provides attorney fees for the prevailing party in a civil action brought against someone who has obstructed the prevailing party's "right-of-way of any established type or title for any

---

(…continued)
SITLA notified them of the impending sale to SSS, *supra* ¶ 10, fails for the same reasons.

canal or other watercourse." Utah Code Ann. § 73-1-15 (LexisNexis 2012) (describing the tort and crime of "obstructing canals or other watercourses"); *id.* § 73-2-28(2) (providing attorney fees for the prevailing party of a civil action brought under Utah Code section 73-1-15). And since the district court awarded them below, the Allens are also entitled to the attorney fees they have requested on appeal. *See CORA USA LLC v. Quick Change Artist LLC*, 2017 UT App 66, ¶ 7, 397 P.3d 759 ("In general, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." (cleaned up)).

¶25    In sum, sufficient record evidence supported the district court's finding that the Dan's Camp ditches existed before 1896. Based on this finding, the district court acted within its discretion in concluding that the Allens had a water conveyance easement from both Dan's Camp and the Garner Springs pursuant to the 1866 Mining Act. Further, that conclusion is dispositive regarding the other issues that the Millennial parties raise on appeal.

## II. The Millennial Parties' Forfeiture

¶26    On cross-appeal, the Allens argue that the district court erred by finding that the Millennial parties had not forfeited their water right by clear and convincing evidence.[8] Utah's water

---

8. In the alternative, the Allens argue that the district court erred in applying the clear and convincing evidence standard instead of a preponderance standard. No Utah appellate court has yet determined what standard of proof applies to forfeiture claims brought under Utah Code section 73-1-4. *See Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.*, 2004 UT 67, ¶ 37 n.3, 98 P.3d 1 (noting that "past forfeiture cases in the arena of water rights have not addressed a forfeiture claimant's evidentiary burden"). We note that other states impose different

(continued…)

forfeiture statute provides that "when an appropriator or the appropriator's successor in interest abandons or ceases to beneficially use all or a portion of a water right for a period of at least seven years, the water right or the unused portion of that water right is subject to forfeiture." Utah Code Ann. § 73-1-4(2)(a) (LexisNexis Supp. 2019).[9] Because the Allens established by clear and convincing evidence that there were at least seven years in which the Millennial parties did not put their water

---

(…continued)

burdens of proof on those seeking to prove nonuse of water. *See, e.g.*, *Staats v. Newman*, 988 P.2d 439, 441 (Or. Ct. App. 1999) (holding that a preponderance standard of proof satisfies the requirements of Oregon's water forfeiture statute); *King v. St. Clair*, 414 P.3d 314, 316 (Nev. 2018) (en banc) (holding that the "party asserting abandonment bears the burden of proving, by clear and convincing evidence, that an owner of the water right intended to abandon it" (cleaned up)). But as we ultimately conclude that the evidence of nonuse in this case was sufficient to satisfy either a preponderance or clear and convincing evidence standard, we do not reach this question.

9. Until 2008, Utah law provided that the owner of a water right forfeited her interest if the right was not put to beneficial use for a period of five years instead of seven. *Compare* Utah Code Ann. § 73-1-4(3)(a) (LexisNexis Supp. 2007), *with id.* § 73-1-4(2)(a) (Supp. 2008). The parties have not argued which version of the statute applies to this case or whether the Allens were required to show nonuse for five years or seven. However, as we explain below, *infra* ¶¶ 27–29, the Allens established by clear and convincing evidence that the MPN water right had not been put to beneficial use for a period of at least seven years, so the outcome is the same under either version of the statute. For convenience, we apply the current version of the statute.

right to beneficial use, we determine that the district court exceeded its discretion in this regard.

¶27 Although there is evidence that Scott Allen irrigated the servient estate before his death in 1994, David Allen testified that he had never seen any person irrigate the servient estate from 1994 through 2011. Two former farm hands for Ross Allen testified that they never witnessed any person irrigate the servient estate between 1994 and 2005. Jeff Holt, the spokesperson for MPN, admitted in his testimony that the servient estate had not been irrigated since Scott Allen's death in 1994. Further, in response to the Allens' interrogatories, none of Scott's children—Jarl, Jenna, or Lesly—could provide any information regarding beneficial use of the water by any of the Millennial parties after 1994. This evidence of nonuse presented by the Allens is sufficient to show forfeiture under either a preponderance-of-the-evidence or a clear-and-convincing burden of proof.

¶28 The Millennial parties do not dispute this evidence or argue that they put the water to beneficial use themselves. Rather, they respond that it was the Allens who put the water to beneficial use between 1994 and 2011 in accordance with an agreement between Ross and Scott in 1977. Thus, according to the Millennial parties, forfeiture is not applicable because the water forfeiture statute does not apply where "the beneficial use of water [is] according to a lease or other agreement with the appropriator or the appropriator's successor in interest." *Id.* § 73-1-4(e)(i). This argument fails for multiple reasons. First, there is unrebutted testimony from David Allen that he never used more water than permitted by his 70% interest in the water right. Second, the district court never found that a binding oral agreement existed between Ross and Scott regarding water use, and we are not in a position to make such a finding. *See Gedo v. Rose*, 2007 UT App 154, ¶ 11, 163 P.3d 659 (declining to make factual determinations bearing on standing in the absence of "district court findings or an undisputed factual record").

Finally, even if such an agreement existed, it terminated no later than 1985 because Ross and Scott formally segregated their interests and Scott began to use his water right for at least a short period, effectively abandoning the alleged prior agreement. Therefore, this argument notwithstanding, there is no evidence that the MPN water right was put to beneficial use between 1994 and 2011, via agreement or otherwise.

¶29 Because the unrebutted evidence at trial established non-use for a period of more than seven years, the Allens proved forfeiture regardless of whether the preponderance-of-the-evidence or clear-and-convincing standard applies. Consequently, the district court exceeded its discretion in concluding that the Millennial parties had not forfeited their water right.

CONCLUSION

¶30 The district court did not exceed its discretion in finding that the Allens had an 1866 Mining Act easement to convey water from both Dan's Camp and the Garner Springs. This conclusion is dispositive of the other issues that the Millennial parties raise on appeal, and we accordingly affirm the district court's rulings respecting those issues.

¶31 Regarding the Allens' cross-appeal, the district court exceeded its discretion when it concluded that the Millennial parties' water right was not forfeited. Accordingly, we reverse and remand to the district court to enter a judgment that the Millennial parties forfeited their water right.

¶32 As the prevailing parties, the Allens are awarded their reasonable attorney fees on appeal in an amount to be determined by the district court on remand.

¶33 Affirmed in part, reversed in part, and remanded.

_____